DON CASEY CO., INC.; CHARLES DON CASEY, SOLE SHAREHOLDER OF DON CASEY CO., INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 42107-84.      Filed October 28, 1986.

*Howard A. Weinberger*, for the petitioner.
*William P. Hardeman*, for the respondent.

OPINION

SIMPSON, *Judge*: This matter is now before us on a motion by the petitioner for reimbursement of its litigation costs under section 7430 of the Internal Revenue Code of 1954.[1] The principal issue for decision is whether the Commissioner was unreasonable within the meaning of that section in pursuing the litigation in this Court.

The petitioner, Don Casey Co., Inc. (the company), was a Texas corporation with its principal office located in Garland, Texas. The company's corporate charter was revoked on August 10, 1983, by the secretary of state of the State of Texas, and it has been inactive and defunct since that time. Charles Don Casey is the sole shareholder of the company and resided in Dallas, Texas, at the time the petition was filed in this case.

The company filed its Federal corporate income tax return on the basis of a fiscal year ending March 31, and it filed its Federal income tax return for the fiscal year ending March 31, 1980, with the Internal Revenue Service Center, Austin, Texas. The company maintained its books and records and filed its Federal income tax returns by use of the accrual method of accounting. We will sometimes identify the company's taxable year by reference to the year in which it ends.

The company was in the silver reclamation business. It recovered silver from used film and processed it into silver bars. It also purchased silver scrap from other processers and silver bars which needed further refining. All silver was sold as silver bars.

In late 1981 or early 1982, the Internal Revenue Service commenced a criminal investigation of the company as a result of a confidential report that the company had willfully omitted income in excess of $2 million. The IRS issued a summons to Mr. Casey to produce the books and records of the company. His attorney, Howard A. Weinberger, advised the IRS that the records would be

---

[1] All statutory references are to the Internal Revenue Code of 1954 as in effect during the year in issue, unless otherwise indicated.

made available in his office. Two special agents, including Russell Shelton, came to Mr. Weinberger's office on March 17, 1982, and all of the records then possessed by Mr. Weinberger, including the general ledger of the company, were made available to the special agents. The agents removed many of the records, but they did not take the general ledger. Mr. Shelton conducted the investigation, and he does not remember seeing the complete general ledger until shortly before the trial.

Subsequently, the IRS recommended that Mr. Casey be charged with a violation of section 7206(1) for willful filing of a false return. The recommendation was based on the alleged failure to report two sales of silver to a subsidiary of General Motors (GM) in March 1980. The first GM sale was on March 4, 1980, and was for $1,361,243.11. The second GM sale was allegedly on March 31, 1980, and was for $809,470.06. In concluding that those sales were not reported, the agent relied upon a financial statement of the company for March 1980. That statement reported:

| | |
|---|---|
| Sales - silver bars (rec'd)... | $636,180.58 |
| Sales - silver flake (cust)... | 422,953.47 |
| Sales - silver film flake ... | 554,938.53 |
| Sales - manufactured items ... | 41,545.40 |
| Total sales... | 1,655,617.98 |

On November 15, 1983, Mr. Weinberger met in Washington, D. C., with an attorney representing the Department of Justice. At that meeting, Mr. Weinberger took the position that the first GM sale had in fact been recorded in the general ledger and included in the reported income. In support of his position, he produced excerpts from the general ledger showing that such sale was recorded as having occurred on March 4, 1980. He also took the position that the second GM sale was not reported for 1980 because the price was not agreed upon until after March 31, 1980. The Justice attorney asked whether Mr. Weinberger would agree to a further investigation, and Mr. Weinberger agreed. The special agent was contacted by the Justice attorney and told of Mr. Weinberger's position and evidence. Nevertheless, the special agent never made any further investigation; he never requested to see the general ledger, and he never interviewed any other witnesses with

respect to the general ledger, nor requested any other documents. Mr. Casey was never charged with any criminal violation.

On November 20, 1984, the Commissioner issued a notice of deficiency to the company in which he determined that the company had omitted $2,406,202.22 from its gross income for 1980 and that the underpayment of tax was due to fraud within the meaning of section 6653(b). In its petition, the petitioner disputed the entire deficiency and its liability for the fraud addition. It alleged that the statute of limitations had run before the issuance of the notice of deficiency. It also alleged that the first GM sale had been reported and that the second GM sale was not reportable for 1980. It alleged that during the latter part of March 1980, the price of silver was fluctuating drastically, that the petitioner and GM agreed that the price of such silver should be computed by "using a ten day average of silver prices both before and after the actual date of transfer of title," and that the price was not determined until after March 31, 1980. In his answer, the Commissioner alleged that the proceeds of the first and second GM sales were not reported, that deposits in the RAD account at the Garland Bank and Trust were not reported, and that sales to Handy and Harman in the amount of $120,167.10, to Rio Grande Jewelers in the amount of $113,095.45, and of telescope scales in the amount of $2,226.50 were not reported. In its reply, the petitioner admitted that deposits were made in the RAD account and that the sales to Handy and Harman and to Rio Grande Jewelers were not reported; it denied for lack of information the allegation concerning the telescope scales.

On June 18, 1985, there was a hearing by an agent of the Appeals Division at which Mr. Weinberger appeared and produced the originals of the general ledger and sales journals for all of fiscal 1980. At that conference, Mr. Weinberger did not explain that the company reclassified sales for purposes of the financial statements. However, the Appeals Officer did not question the validity of the general ledger shown to him, and the explanation of the reclassification would not have altered his conclusion; he accepted the

petitioner's return since it reflected the income shown in the general ledger and the proper amount of tax.

The Appeals Officer also requested whether the company would agree to a further examination of its records, and Mr. Weinberger agreed. A revenue agent came to Mr. Weinberger's office on November 25, 1985, and examined the company's records, including the general ledger, for approximately 2 hours.

The case was set for trial at a session of the Court commencing on March 3, 1986. On January 30, 1986, the counsel for the Commissioner advised Mr. Weinberger that he would concede the case, but on February 18, 1986, he reported to Mr. Weinberger that the Regional Counsel had overruled him and that the case would be tried.

At the trial, the general ledger of the company was admitted in evidence and showed that the first GM sale had been recorded. The proceeds of such sale were included in the income of the company for 1980. In connection with the second GM sale, the purchase order stated in part: "Invoice will be average Handy & Harmon of next five market days following quantity release less 1%" and "Invoice will be average Handy & Harmon of preceding five market days prior to shipment less 1%." The silver was delivered to the GM subsidiary on March 31, 1980. The invoice had a typed price of $838,665.37; but that price was crossed out, and a price of $809,470.06 was written in. The change was initialed by an employee of the company, who remembered delivering the silver, remembered that there was some dispute over the price, and remembered that after consulting with Mr. Casey, he initialed the changed price. However, he did not remember whether the new price was inserted on March 31, 1980, or thereafter.

Special Agent Shelton testified and admitted that Michael Furlow, who was the comptroller and financial vice president of the company from July of 1980 until October 1981, told him that the first GM sale had been reclassified, although Mr. Furlow did not know why that was done. Mr. Shelton also admitted that his conclusion that the second GM sale was reportable in 1980 was based solely upon the purchase order and invoice; although the accountants for the company told him that there was some question about

when the price was agreed upon and when the sale was completed, Mr. Shelton never interviewed William W. Parmenter, the buyer for the GM subsidiary and the person most familiar with the circumstances surrounding the purchase by such subsidiary, nor did Mr. Shelton interview any employees of the company regarding the circumstances surrounding such sale.

Mr. Furlow, who left the company because he was fired, was called by the Commissioner as his witness. He prepared the workpapers from which the company's 1980 return was prepared, and the proceeds of the first GM sale were included in income and reclassified by him. However, he believed that Mr. Casey withheld the records concerning some bank accounts and that the return did not report all receipts of the company.

Another former employee of the company testified that some sales of silver were made for cash and that he understood that the proceeds of some sales were not recorded in the books of the company. He also testified that on occasion, Mr. Casey commented with respect to the payment of taxes that "he needed it more than the government" and "it was maybe doing him better than the government." Another former comptroller of the company, who was also dismissed, testified that Mr. Casey altered assay records in order to reduce what the company paid for silver. He also said that Mr. Casey ordered that invoices not be written for all cash sales and that all cash sales should not be recorded; according to that employee, Mr. Casey said "that there was no sense paying taxes on everything that was recorded, or everything that came in."

In connection with the second GM sale, Mr. Parmenter testified that the price was to be based upon the average Handy and Harman quotations for the 5 days preceding the sale. However, he admitted that the price was computed by the accounting department of his company. He was asked to compute the price in accordance with his understanding: he excluded the days of March 29 and 30 since they were a weekend; he used the Handy and Harman quotations for March 24 through 28; and he came up with a total price of $641,037. He had no explanation for the difference between

that price and the price actually paid by his company. The purchase price was in fact paid on April 9, 1980.[2]

As a witness, Mr. Casey said that there was a bitter domestic dispute between himself and his former wife from 1979 to 1981. He said that she became a co-director of the company and that all checks had to be approved by both of them. She interfered with business decisions and even filed a petition for bankruptcy of the company.

Mr. Casey explained that he directed the accounting department, in preparing the financial statement, to reclassify the first GM sale by reference to the source of the silver. He said that he had historically classified sales by reference to source because the profits differed depending upon the source of the silver.

Mr. Casey testified that the RAD account was established in January 1980; he said that at that time, the difficulties had already developed with his wife and that she was attempting to interfere with the business; he established the RAD account to avoid her interference and to furnish funds that he could use without her knowledge; the account included deposits from the proceeds of the Rio Grande sale, a Handy and Harman sale, and certain smaller sales of silver for cash.

Mr. Casey's wife learned about the RAD account in April or May of 1980. However, Mr. Casey refused to show her the records of the account until she issued a subpoena to have the records produced at a deposition to be taken in December 1980. Shortly before that deposition, Mr. Casey took the records to his CPA who had prepared the 1980 tax return of the company. The CPA pointed out to him that the sales reflected in that account had not been shown on the company's return for 1980. It was decided that Mr. Furlow should recompute the sales and tax liability of the company. Mr. Furlow reported to Mr. Casey that as a result of other adjustments, the inclusion of the RAD sales did not result in any increase in tax liability of the company for 1980.

At the conclusion of the trial, the Court rendered a bench opinion. In part, the Court stated:

---

[2]The company did not report the second GM sale because it became insolvent in 1981 and did not file a return for such taxable year.

> Here we have a case in which the Commissioner has determined a deficiency, and an addition to tax for fraud. * * * it is agreed that the statute of limitations on the year at issue, the 1980 fiscal year, has run, if the Commissioner does not show fraud.
>
> Consequently, if there is no showing of fraud, there is no deficiency. * * *.
>
> * * * it is * * * well settled that the Commissioner has to prove fraud * * * by clear and convincing evidence. * * *

The Court then reviewed the evidence concerning the first GM sale, the second GM sale, and the RAD account. The Court found that the proceeds of the first GM sale had been included in the income reported by the company for 1980 and that the proceeds were reclassified on the financial statement for business reasons. The Court concluded that the purchase order of the second GM sale was ambiguous as to how and when the price of the silver was to be determined, that under the circumstances, there was a genuine doubt as to when the sale was reportable, and that the failure to report the sale for 1980 was not fraudulent. With respect to the RAD account, the Court recognized that it was established to withhold information from Mr. Casey's wife because of their domestic dispute, that the failure to disclose the records to those preparing the company's tax return may have been negligent, but that such failure was not willful or fraudulent. For these reasons, the Court concluded that the Commissioner had not established fraud by clear and convincing evidence.

After the trial, the petitioner timely made its motion for reimbursement of litigation costs in accordance with Rule 231 of the Tax Court Rules of Practice and Procedure.[3] Thereafter, in accordance with Rule 232, counsel for the parties conferred for the purpose of settling any matters that could be agreed upon, and the Commissioner filed a written objection to the motion. The petitioner then filed its reply to that objection.

Section 7430(a) provides that the prevailing party in any civil proceeding brought by or against the United States in connection with the determination of any tax under the Internal Revenue Code in a court of the United States, including the Tax Court, may be awarded a judgment for

---

[3] Any reference to a Rule is to the Tax Court Rules of Practice and Procedure.

reasonable litigation costs. Section 7430(b) provides that an award may not exceed $25,000 and that an award may not be made unless "the prevailing party has exhausted the administrative remedies available to such party within the Internal Revenue Service." A prevailing party is defined by section 7430(c)(2) to mean a party (other than the United States) which establishes "that the position of the United States in the civil proceeding was unreasonable" and that such party—

(ii)(I) has substantially prevailed with respect to the amount in controversy, or

(II) has substantially prevailed with respect to the most significant issue or set of issues presented.

In his response, the Commissioner concedes that the petitioner has substantially prevailed with respect to the amount in controversy and that the litigation costs claimed by the petitioner, $23,721.60, are reasonable and allowable if the petitioner establishes that it is entitled to an award under section 7430. However, the Commissioner maintains that the petitioner is not entitled to such an award because it did not exhaust its administrative remedies and because it has not established that the position of the Commissioner was unreasonable.

The Commissioner admits that he "may now agree" that the proceeds of the first GM sale were reported in the company's records and on the tax return, but he contends that his conduct was reasonable. He asserts that the general ledger was not produced pursuant to the summons and that the Government lawyers considered the pages from the general ledger which were supplied to the Justice Department to be "fraudulent and counterfeited." The Commissioner's counsel explains that he was willing to settle the case at one time because he was not sure that he could prove the pages to be counterfeit, but the Regional Counsel believed that the case should be presented to the Court to let it decide whether the evidence is trustworthy. The Commissioner's counsel also declares that the petitioner did not reveal the reclassification of the proceeds of that sale before the trial and that he did not learn about it from any other witnesses. With respect to the second GM sale, the Commissioner argues that the purchase order was not

ambiguous, that the price of that sale was determined on March 31, 1980, and that it was based on the Handy and Harman quotations from March 26, 1980, and the 4 preceding days. Finally, the Commissioner also takes the position that the petitioner did not exhaust its administrative remedies because, apparently, it did not explain the reclassification to the Appeals Officer. Thus, we must decide what constitutes reasonable conduct by the Commissioner under section 7430.

The adjudication of this issue requires that it be put in perspective. The treatment of litigation costs in America was set forth in *Spencer v. N.L.R.B.*, 712 F.2d 539, 543-545 (D.C. Cir. 1983):

Under that longstanding doctrine [the American rule], each litigant ordinarily must pay his own lawyer. *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 247 * * * (1975). The rule has only two narrow exceptions: when a loser "has acted in bad faith, vexatiously, wantonly, or for oppressive reasons," he may be obliged to reimburse the winner for his attorneys' fees, *F.D. Rich Co. v. United States*, 417 U.S. 116, 129, * * * (1974) (dicta); accord *Lipsig v. National Student Marketing Corp.*, 663 F.2d 178, 180 (D.C. Cir. 1980) (per curiam); and, when an individual litigant, by successfully maintaining a suit, has conferred a benefit on a group of persons, the court may allow him to recover his attorneys' fees from the beneficiaries, *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 392-97 * * * (1970). Traditionally, the United States was even less vulnerable to an award of attorneys' fees than a private litigant; in the absence of an express statutory provision, even the aforementioned "bad faith" and "common benefit" rules could not be invoked against the federal government. *Pealo v. Farmers Home Administration of the United States Department of Agriculture*, 562 F.2d 744, 748 (D.C. Cir. 1977) (alternative holding); *Rhode Island Committee on Energy v. General Services Administration*, 561 F.2d 397, 405 (1st Cir. 1977). * * *

Since at least the 1920s, the restrictive American doctrine pertaining to the allocation of attorneys' fees has been subjected to persistent attack. In the 1960s and early 1970s, federal courts sensitive to these criticisms began to experiment with various alternative, more liberal, fee-shifting rules. The most important of these developments was the so-called "private attorney general" theory, under which prevailing parties were allowed to recover attorneys' fees when their suits resulted in enforcement of "important societal rights." In 1975, in the *Alyeska* case, the Supreme Court called a halt to this judicially managed doctrinal innovation. The Court concluded that, in view of the importance and complexity of the field and of the history of legislative involvement, "it is apparent that the circumstances under which attorneys' fees are to be awarded and the range of discretion of the courts in making those awards are matters for Congress to determine." 421 U.S. at 262 * * * . Conse-

quently, it held that, in the absence of specific statutory authorization, federal courts sitting in non-diversity cases could award attorneys' fees to prevailing parties only under the established common law exceptions to the American Rule. *Id.* at 247, 257-60, 271 * * * .

The Supreme Court's message was not lost on the legislature. A year after the *Alyeska* decision, Congress passed the Civil Rights Attorney's Fees Awards Act, which allows prevailing parties in suits brought under specified civil rights statutes to recover "a reasonable attorney's fee as part of the costs." The Equal Access to Justice Act, passed four years later, constitutes an even more comprehensive response to the Supreme Court's invitation and self-abnegation. The Act applies to all civil actions brought by or against the United States and allows private prevailing parties to recover attorneys' fees from the government in a wide variety of circumstances.

[Fn. refs. omitted.]

In litigation before this Court, we followed the American rule. In *Key Buick Co. v. Commissioner*, 68 T.C. 178 (1977), affd. 613 F.2d 1306 (5th Cir. 1980), we recognized the general proposition that a petitioner, even though successful, cannot recover his litigation costs in this Court. We examined the Civil Rights Attorney's Fees Awards Act, Pub. L. 94-559, 90 Stat. 2641, and held that it was not applicable to litigation in this Court. 68 T.C. at 179. See *Shapiro v. Commissioner*, 73 T.C. 313 (1979); *Sharon v. Commissioner*, 66 T.C. 515 (1976), affd. per curiam 591 F.2d 1273 (9th Cir. 1978). In *McQuiston v. Commissioner*, 78 T.C. 807, 812 (1982), affd. without published opinion 711 F.2d 1064 (9th Cir. 1983), we considered the Equal Access to Justice Act, Pub. L. 94-481, tit. II, sec. 204(a), 94 Stat. 2327 (28 U.S.C. sec. 2412 (1982)), and held that it does not apply to proceedings in this Court. Thus, it does not authorize this Court to award litigation costs to the prevailing party.

In 1982, Congress decided to experiment with the allowance of litigation costs in tax litigation. It enacted section 7430 and made it applicable to cases commenced after February 28, 1983. Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, sec. 292(a), 96 Stat. 324, 572-574. It does not allow all successful petitioners to recover their litigation costs from the Commissioner; in addition to prevailing, a petitioner must show that he exhausted his administrative remedies and that the position of the United States was unreasonable. The legislative

history furnishes some guidelines for determining what constitutes unreasonable conduct by the Commissioner:

The committee intends that the determination by the court on this issue is to be made on the basis of the facts and legal precedents relating to the case as revealed in the record. Other factors the committee believes might be taken into account in making this determination include, (1) whether the government used the costs and expenses of litigation against its position to extract concessions from the taxpayer that were not justified under the circumstances of the case, (2) whether the government pursued the litigation against the taxpayer for purposes of harassment or embarrassment, or out of political motivation, and (3) such other factors as the court finds relevant. * * * [H. Rept. 97-404, at 12 (1981).]

In further delineation of the test of reasonableness, we said in *Baker v. Commissioner*, 83 T.C. 822, 828-829 (1984), vacated and remanded on another issue 787 F.2d 637 (D.C. Cir. 1986):

In any event, the determination of reasonableness should be made based upon all the facts and circumstances surrounding the proceeding and the fact that the Government eventually loses the case should not be determinative. * * *

Our determination as to whether respondent acted reasonably in this case will involve a review of the legal basis for his position and of certain actions taken during litigation. * * *

To recover litigation costs under the Equal Access to Justice Act, a successful party must show that the position of the United States was not "substantially justified." 28 U.S.C. sec. 2412(d)(1)(A) (1982). Several courts have held that the "substantially justified" test is in essence a test of reasonableness. *Ashburn v. United States*, 740 F.2d 843, 850 (11th Cir. 1984); *Foster v. Tourtellotte*, 704 F.2d 1109, 1111 (9th Cir. 1983); *S & H Riggers & Erectors, Inc. v. O.S.H.R.C.*, 672 F.2d 426, 430 (5th Cir. 1982); *U.S. for Heydt v. Citizens State Bank*, 668 F.2d 444, 447 (8th Cir. 1982). One circuit, that for the District of Columbia, has held that the "substantially justified" standard is "slightly more stringent." *Spencer v. N.L.R.B.*, 712 F.2d at 558. In *Spencer*, the court observed that an attorney for the United States may have acted reasonably in pursuing litigation, but if he was acting pursuant to a directive of his agency, and if the policy of the agency is unreasonable, a successful party may be awarded his litigation costs. Similarly, an

agency may reasonably seek the reversal of a precedent, but if it is unsuccessful, the prevailing party may be awarded his litigation costs. Despite those possible differences between the "substantially justified" and the "reasonable" standards, much of the discussion and analysis in the opinions dealing with the Equal Access to Justice Act is helpful in defining the parameters of reasonableness. *Baker v. Commissioner*, 83 T.C. at 828.

The analysis of the Fifth Circuit in *S & H Riggers* is particularly helpful:

The EAJA was enacted as a three-year experiment in the allocation of the costs of litigation involving the government. The Act rejects the traditional "American rule" of attorney fees according to which fees are not awarded unless the suit was prosecuted in bad faith because otherwise the effect would be to penalize and deter good faith litigation, and moves toward the English rule that the prevailing party ordinarily is awarded the costs of litigation. H.R. Rep. No. 1418, 96th Cong., 2d Sess. 8-10 (1980), reprinted in 1980 U.S. Code Cong. & Ad. News 4953, 4986-88. The premise of the English rule is that a fee award is not a sanction to deter or penalize losing litigation but is a proper allocation of the costs of the litigation and a measure that lifts the cost deterrent facing the successful litigant. * * *

* * * the Act does not adopt the position that the government should compensate all prevailing parties but instead enacts a compromise position embodied in the standard of "substantial justification:"

This standard balances the constitutional obligation of the executive branch to see that the laws are faithfully executed against the public interest in encouraging parties to vindicate their rights.

*Id.* at 10, 1980 U.S. Code Cong. & Ad. News at 4989.

Despite this lack of a precise theoretical underpinning, some practical articulation of the standard can be derived from further discussion in the legislative history. The standard is not as lenient as that governing fee awards against plaintiffs in Title VII suits, where to avoid the award the plaintiff need only show that the case was nonfrivolous, that is, having some justification, merit or foundation. See *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412 * * * (1978). By contrast, under the EAJA, the justification for the government's position must be "substantial." * * * "where a party has had to engage in lengthy administrative proceedings before final vindication of his or her rights in the courts, the government should have to make a *strong showing* to demonstrate that its action was reasonable." H.R. Rep. No. 1418, *supra*, at 10, 18; 1980 U.S. Code Cong. & Ad. News, at 4989, 4997 (emphasis added).

The burden of showing substantial justification for a case that respondents lost is not insurmountable:

The standard * * * should not be read to raise a presumption that the Government position was not substantially justified, simply because it lost the case. Nor, in fact, does the standard require the Government to establish that its decision to litigate was based on a substantial probability of prevailing.

*Id.* at 11, 1980 U.S. Code Cong. & Ad. News at 4990. And despite the requirement of a "strong showing" of a substantial justification, the standard is not heightened beyond the requirement that the government show "that its case had a reasonable basis both in law and fact," for "the test of whether or not a government action is substantially justified is essentially one of reasonableness." *Id.* at 11, 1980 U.S. Code Cong. & Ad. News at 4989.

[672 F.2d at 429-430; fn. refs. omitted; emphasis in original.]

In *Spencer v. N.L.R.B.*, *supra*, the District of Columbia Circuit suggested three factors to consider in judging the position of the United States: (1) The clarity of the law, (2) the length and complexity of the litigation, and (3) whether the treatment of the litigant is consistent with the treatment of other persons. 712 F.2d at 559-560. The court considered that if the law is clear, or if the litigation will be lengthy, complex, and expensive, or if the litigant is being treated differently than other persons similarly situated, the United States should bear a heavy burden to justify pursuing the litigation.

In applying these general principles, the courts have held that it was reasonable for the United States to attempt to sustain a Safety and Health regulation which constituted "a novel but credible extension and interpretation of the law." *S & H Riggers & Erectors, Inc. v. O.S.H.R.C.*, 672 F.2d at 431. Similarly, in *Spencer v. N.L.R.B.*, 712 F.2d at 567, the court held that the position of the United States was substantially justified where the interpretation of the N.L.R.B. was "sufficiently plausible." In *Ashburn v. United States*, *supra*, the court concluded that the United States was not unreasonable when it took 11 months to evaluate and concede a complex tax case. In *Baker v. Commissioner*, 83 T.C. 822 (1984), the case was commenced in April 1983, and the Cleveland office of the IRS agreed to concede it in April 1984. The petitioner argued that the IRS was unreasonable in not conceding his case because other similar cases were being settled elsewhere by the IRS. The Tax Court held that the IRS was not unreasonable under such

circumstances, but the District of Columbia Circuit remanded because it believed that the Tax Court should consider whether the IRS had a national policy to settle such cases and whether the IRS was unreasonable in delaying the settlement of the petitioner's case. *Baker v. Commissioner*, 787 F.2d 637 (D.C. Cir. 1986). In *DeVenney v. Commissioner*, 85 T.C. 927 (1985), the Commissioner claimed fraud, and this Court held that he had failed to carry his burden of proof; nevertheless, we found that it was not unreasonable for the Commissioner to pursue the litigation because the petitioner did not advise him of the identity of certain key witnesses until shortly before the trial, when there was insufficient time for the Commissioner to interview them. On the other hand, in *United States v. Estridge*, 797 F.2d 1454 (1986), the Eighth Circuit affirmed per curiam the finding of the District Court that the Commissioner had acted unreasonably; the Commissioner had acted contrary to the weight of the evidence and had relied upon the statements of individuals whose testimony was suspect. *Moats v. United States*, 576 F. Supp. 1537 (W.D. Mo. 1984), and 564 F. Supp. 1330 (W.D. Mo. 1983).

The ultimate issue for decision is who should bear the petitioner's costs of pursuing the litigation in this case: the petitioner was successful, and should it bear its own costs of litigation in accordance with the historic American rule; or do the circumstances bring the case within the group of cases with respect to which Congress intended for the burden of the expenses of litigation to be borne by and shifted to the Commissioner. It is the position of this Court that section 7430 is to be applied only to the events occurring during the litigation. *Baker v. Commissioner*, 83 T.C. 822 (1984). The circuit courts are divided on the issue of whether the position of the United States is to be based solely on the events during litigation or whether such position includes an examination of the events occurring before the beginning of the litigation. *Ashburn v. United States, supra; Baker v. Commissioner*, 787 F.2d 637 (D.C. Cir. 1986); *United States v. Balanced Financial Management*, 769 F.2d 1440, 1450 (10th Cir. 1985); contra *Powell v. Commissioner*, 791 F.2d 385 (5th Cir. 1986), revg. and remanding a Memorandum Opinion of this Court; *Kaufman*

*v. Egger,* 758 F.2d 1, 4 (1st Cir. 1985). Here, we must bear in mind certain events that occurred before the case was commenced: the issuance of the summons, the meeting at Mr. Weinberger's office at which records, including the general ledger, were made available to the Commissioner, and the meeting between Mr. Weinberger and the Department of Justice at which pages from the general ledger were presented to Justice. We must keep those facts in mind in order to know what the Commissioner knew when this case was commenced and to judge his conduct following the filing of the petition. Our holding is based on whether it was reasonable for him to pursue this litigation, taking into consideration what he and his agents knew, and therefore, we base our holding solely on the events that occurred after the case was commenced and do not have to reconsider our position in *Baker.*

Our evaluation of the circumstances of this case leads us to conclude that it was not reasonable for the Commissioner to pursue this litigation and that therefore he should bear the petitioner's costs of litigation. When the law is not clear, it may be reasonable for the Commissioner to pursue litigation that may tend to clarify the law, even though such litigation will be burdensome and expensive for the petitioner, and even though the Commissioner's chances of success may be marginal. However, here, the law is clear; the Commissioner was not pursuing this litigation to establish any significant principle of tax law. He knew that he had the burden of proving fraud by clear and convincing evidence, and he knew that the litigation would be burdensome and expensive for the petitioner. He should have considered these circumstances in deciding whether to pursue the litigation; it is not enough that he had a doubt about the trustworthiness of some of the petitioner's documents; he should not have pursued the litigation unless he was convinced that he had a reasonable basis for believing that he could prove fraud by clear and convincing evidence.

The Commissioner, through his special agent, maintains that the general ledger was not produced pursuant to the summons; but on the record before us, we are convinced that it was in Mr. Weinberger's possession at the time of

his meeting with the special agent and that it was made available to the special agent. Moreover, after Mr. Weinberger presented to the Justice Department pages allegedly taken from the general ledger, the Commissioner, if he did not accept the evidence, had the responsibility of making a further investigation to ascertain whether those pages were authentic; it is not enough for him to say merely that he suspected the authenticity of such pages. The petitioner was willing to cooperate in a further investigation, and even if the general ledger had not been made available to the special agent earlier, he had the responsibility of taking up Mr. Weinberger's offer and visiting his office to examine the general ledger.

Likewise, we are not persuaded by the Commissioner's argument that he was unaware of the reclassification of the proceeds of the first GM sale until the time of the trial. The special agent admitted that the investigation was commenced as a result of a report by a confidential source, and several of the Commissioner's witnesses, who had worked for the company and had been fired, reported on statements made by Mr. Casey allegedly showing that he did not wish to report all of his taxable income. It appears to us that the special agent relied unduly on his confidential source and the statements by the former employees of the company. Such information may have warranted an investigation, but such information did not justify a superficial conclusion that income was omitted. The special agent should have analyzed the general ledger, should have sought to reconcile its information with the financial statements, and should have interviewed his own witnesses about such reconciliation—they knew of the reclassification. Had the special agent made such investigation, he would have learned that the proceeds of the first GM sale had been reported.

We remain of the view that there was a substantial doubt as to when the second GM sale was completed and reportable. The purchase order states in one paragraph that the sales price was to be based on the quotations preceding the sale, but in another paragraph, it states that the price was to be based upon quotations after the sale. The GM representative was firm in his statement that the price was to be based on the quotations preceding the sale. However,

he then admitted that the price was computed by the accounting department, and the price computed by him at trial was far different than the price agreed upon by the parties to the sale. Such circumstances cast doubt on his testimony that the sales price was to be based upon quotations preceding the sale. We need not decide when, in fact, the sale was completed; it is clear to us that there was a substantial doubt, and under such circumstances, the Commissioner knew, or should have known, that he lacked the clear and convincing proof needed to establish that the omission of the proceeds of the sale was fraudulent.

Mr. Casey's treatment of the RAD account was irregular and perhaps negligent. Yet, we were persuaded by his testimony that the account was established to withhold the information from his wife; nevertheless, he should have disclosed the information to Mr. Furlow and the CPA when the time came to prepare the tax return. However, the circumstances surrounding the establishment of that account and the failure to reveal the information to the preparers of the tax return are certainly not sufficient to show fraud.

The Commissioner has not elaborated on his position that the petitioner did not exhaust his administrative remedies. The Commissioner admits that there was a hearing before the Appeals Division and that Mr. Weinberger did appear at such hearing on behalf of the petitioner. Apparently, the Commissioner rests his claim on the argument that Mr. Weinberger should have explained the reclassification of the proceeds of the first GM sale. In our judgment, the Commissioner's argument fails. Mr. Weinberger participated in that hearing, and he presented sufficient information and argument to convince the Appeals officer of the merits of his case. Under such circumstances, the Commissioner cannot later argue that the petitioner did not exhaust his administrative remedies.

Finally, when we weigh the weakness of the Commissioner's case and the fact that the litigation might have been avoided if he had conducted the indicated investigation against the burden imposed upon the petitioner by the Commissioner's pursuing this litigation, we conclude that the Commissioner should not have (and it was unreasonable

for him to have) pursued the litigation. Since he chose to do so, we believe that he should bear the petitioner's costs of litigation, and we so hold.

> *The petitioner's motion for costs will be granted and decision will be entered for the petitioner.*

Reviewed by the Court.

STERRETT, GOFFE, CHABOT, NIMS, PARKER, WHITAKER, KÖRNER, SHIELDS, HAMBLEN, COHEN, CLAPP, SWIFT, JACOBS, GERBER, WRIGHT, PARR, and WILLIAMS, *JJ.*, agree with this opinion.

WELLS, *J.* did not participate in the consideration of this case.

