COASTAL PETROLEUM REFINERS, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 32093-85.          Filed May 8, 1990.

*Michael L. Steele,* for the petitioner.
*Dale A. Raymond,* for the respondent.

OPINION

RUWE, *Judge:* Petitioner is a corporation organized and existing under the laws of the State of California. At the time the petition was filed, petitioner had its principal office at 14711 Bentley Circle, Tustin, California.

On July 3, 1985, respondent mailed a notice of deficiency to petitioner determining deficiencies and an addition to tax as follows:

| TYE | Deficiency | Sec. 6653(b) |
|-----|-----------|--------------|
| 1/31/80 | $38,663 | - - - |
| 1/31/81 | 552,926 | $276,463 |

| TYE | Deficiency | Sec. 6653(b)(1) |
|-----|-----------|--------------|
| 1/31/82 | $181,326 | - - - |

Prior to the trial of this case, respondent conceded two of the four basic issues. Subsequent to trial, and prior to the filing of opening briefs, respondent conceded the remaining amounts in issue. The case is now before us on petitioner's motion for litigation costs, which is opposed by respondent.

Section 7430(a)[1] authorizes an award of reasonable litigation costs to the "prevailing party" in a tax case. For petitioner to be a prevailing party, as that term is defined in section 7430(c)(2), it must establish, among other things, "that the position of the United States in the civil proceeding was unreasonable" and that petitioner "substantially prevailed."[2] Sec. 7430(c)(2)(A). Respondent's primary argument is that he acted reasonably in pursuing this litigation and that petitioner is not, therefore, a prevailing

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

This case is governed by sec. 7430, as enacted by the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. 97-248, sec. 292(a), 96 Stat. 324, 572-574. Sec. 7430, as amended by the Tax Reform Act of 1986, is effective for civil tax proceedings commenced after Dec. 31, 1985. Tax Reform Act of 1986, Pub. L. 99-514, sec. 1551(h)(3), 100 Stat. 2085, 2753. Sec. 7430, as subsequently amended by the Technical and Miscellaneous Revenue Act of 1988, is effective for civil tax proceedings commenced after Nov. 10, 1988. Technical and Miscellaneous Revenue Act of 1988, Pub. L. 100-647, sec. 6239(d), 102 Stat. 3342, 3746.

[2]For civil tax actions or proceedings commenced after Dec. 31, 1985, sec. 1551(d)(1) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2752, changed the language describing the position of the United States from "unreasonable" to "was not substantially justified." However, this and other courts have held that the "substantially justified" standard is not a departure from the "reasonableness" standard. *Sokol v. Commissioner,* 92 T.C. 760, 764 n. 7 (1989); *Sher v. Commissioner,* 89 T.C. 79, 84 (1987), and cases cited therein, affd. 861 F.2d 131 (5th Cir. 1988).

party. See sec. 7430(c)(2)(A)(i). Respondent concedes that petitioner has substantially prevailed with respect to the issues presented. Respondent also concedes that petitioner has exhausted its administrative remedies within the Internal Revenue Service as required by section 7430(b)(2).

Respondent also opposes an award of litigation costs on the ground that petitioner has not demonstrated that the amounts claimed are reasonable. Petitioner asks for litigation costs in the amount of $93,465. Petitioner did not file an additional affidavit containing detailed information regarding fee arrangements, hours spent, etc., as required by Rule 232(d). In any event, the preamendment version of section 7430, applicable to cases commenced prior to January 1, 1986, such as this case, limits the amount of litigation costs to $25,000.

Neither party requests a hearing on petitioner's motion and both parties expressed the belief that the record supports their respective positions.

In determining whether the Government's position is reasonable, we have held that we will only examine the events occurring after the filing of the petition, i.e., only the Government's in-court litigating position. *Rutana v. Commissioner*, 88 T.C. 1329, 1332 (1987); *Don Casey Co. v. Commissioner*, 87 T.C. 847, 861-862 (1986); *Wasie v. Commissioner*, 86 T.C. 962, 967-968 (1986); *Baker v. Commissioner*, 83 T.C. 822, 827 (1984), affd. on this point 787 F.2d 637, 641-642 (D.C. Cir. 1986). However, the circuit courts are divided on this issue. See *Sokol v. Commissioner*, 92 T.C. 760, 764 (1989).[3] The Ninth Circuit Court of Appeals, to which appeal of this case would lie, has held that it is appropriate to look also at the Government's administrative position prior to the filing of a petition when determining whether the Government was unreasonable. *Sliwa v. Commissioner*, 839 F.2d 602 (9th Cir. 1988). We will, therefore, follow the ruling of the Ninth Circuit on this point. *Golsen v. Commissioner*, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971). We find that petitioner has not established

---

[3]For a more detailed account of the split in the circuits and the most recent statutory change in the definition of the "position of the United States," see *Sokol v. Commissioner, supra* at 764 n. 8.

that respondent's position was unreasonable at either the administrative or litigation stages of this case.

A party seeking litigation costs bears the burden of proving entitlement to them. *Stieha v. Commissioner,* 89 T.C. 784, 790 (1987); *Rutana v. Commissioner, supra* at 1332; *Baker v. Commissioner,* 83 T.C. at 827. In meeting this burden, petitioner must show that the legal precedent does not substantially support respondent's position given the facts available to respondent. *DeVenney v. Commissioner,* 85 T.C. 927, 930 (1985); see *Sliwa v. Commissioner, supra.*

There were four basic issues raised in the petition and contested in the answer. Two were conceded by respondent prior to trial. The first of the issues conceded before trial involved whether certain insurance proceeds were includable in petitioner's income for the year ended January 31, 1982, as determined by respondent, or for the year ended January 31, 1983, as reported by petitioner. Because of the impact this issue has on a net operating loss carryback, it is also determinative of respondent's deficiency determination for the year ended January 31, 1980. The notice of deficiency determined that petitioner should have *accrued* the insurance proceeds in the taxable year ended January 31, 1982. Petitioner's motion alleges that the insurance proceeds were *received* in the taxable year ended January 31, 1983. Petitioner's motion makes no specific allegations regarding the factual and legal controversy nor does it say how much time was spent on this issue or what evidence was presented to respondent. Respondent alleges that the parties spent very little time on this issue. It appears from respondent's pretrial memorandum, which was received by the Court over 2 months prior to trial, that this issue was no longer being contested by respondent at that time. Based on the record before us, petitioner has not established that respondent failed to act reasonably with respect to this issue.

The second issue conceded by respondent prior to trial concerned the addition to tax for fraud for the year ended January 31, 1981. Again, petitioner alleges that respondent's concession was unreasonably delayed but alleges practically no facts and offers little argumentation to

support his claim. Deciding whether a deficiency is due to fraud is a highly factual determination. We will not assume that respondent's position was unreasonable simply because he conceded the issue. *Sokol v. Commissioner, supra* at 767. Whether respondent was unreasonable in initially taking the position that petitioner committed fraud must be based upon the facts reasonably available to respondent when he maintained that position. See *Rutana v. Commissioner, supra; Don Casey Co. v. Commissioner, supra; DeVenney v. Commissioner, supra.* Petitioner has not alleged or presented specific facts warranting a conclusion that respondent's preconcession position on the fraud issue was unreasonable.

At the trial there remained only two issues regarding the year ended January 31, 1981. The first issue involved the statute of limitations. The second issue involved respondent's disallowance of part of petitioner's cost of goods sold. The amount disallowed represented the portion of the price petitioner paid for the purchase of oil that was in excess of its true value.

Petitioner's motion for litigation costs makes no allegation that respondent was unreasonable regarding the statute of limitations issue. Forms 872 (Consent to Extend the Time to Assess Tax) were executed by an individual authorized to act for petitioner and if the Forms 872 were valid, then the notice of deficiency was timely mailed. At the trial, petitioner alleged that the Forms 872 were executed under duress. There is no evidence in the record that would lead us to conclude that it was unreasonable for respondent to have taken the position that the Forms 872 were valid. [4]

The principal focus of the trial was the cost of goods sold issue, and it is on this issue that petitioner makes its primary argument that it is entitled to litigation costs. Respondent states that his litigating position at the time of trial was based upon the stipulation of facts and attached exhibits. Respondent argues that his post-trial concession was not based upon new facts presented at trial, but rather

---

[4]Respondent did not concede the statute of limitations issue, but his concession of the cost of goods sold issue after trial eliminates the need to decide whether petitioner executed and agreed to valid extensions of the period of limitations.

upon a reconsideration of his basic legal position. Respondent acknowledges that reconsideration of his legal position was prompted, at least in part, by reservations expressed by the Court at the time of trial. It is apparent that respondent's post-trial concession was based on an abandonment of his legal position.[5] Therefore, we need to decide whether, in light of the uncontested facts, respondent's legal position at trial was unreasonable.[6] A brief recitation of the undisputed facts and respondent's legal position is necessary.

At all relevant times, including the fiscal year ended January 31, 1981, petitioner was in the business of selling petroleum products. Petitioner purchased crude oil for various purposes, including resale and refining. Its refined products included naphtha and diesel and residual fuel oil. Crude oil refers to unrefined oil extracted directly from the ground. Residual fuel oil is a product produced by refining crude oil.

During the relevant period, the Department of Energy (DOE) administered mandatory price and allocation regulations affecting the petroleum industry. The regulations included the Crude Oil Entitlements Program. Each month, DOE would issue "entitlements" which could be sold. DOE determined the value of each entitlement based on monthly reports filed by all participants in the program. Under this program, petitioner received entitlements for barrels of crude oil that were run through its refinery. Residual fuel oil was exempted from the price control program administered by DOE effective April 1, 1976, and, therefore, did not give rise to entitlements. As a result of the Crude Oil

---

[5]Concurrent with respondent's concession, petitioner signed a closing agreement promising that it would not claim a theft loss deduction for the same amounts in a subsequent year.

[6]The legislative history of sec. 7430 sets forth guidelines for determining whether respondent's conduct was unreasonable:

The committee intends that the determination by the court on this issue is to be made on the basis of the facts and legal precedents relating to the case as revealed in the record. Other factors the committee believes might be taken into account in making this determination include, (1) whether the government used the costs and expenses of litigation against its position to extract concessions from the taxpayer that were not justified under the circumstances of the case, (2) whether the government pursued the litigation against the taxpayer for purposes of harassment or embarrassment, or out of political motivation, and (3) such other factors as the court finds relevant. * * * [H. Rept. 97-404, at 12 (1981).]

Our analysis of respondent's position in this case is based on the facts and existing legal precedents, since we find no indication in the record that respondent's position was motivated by other factors.

Entitlements Program, qualifying crude oil had a market price higher than that of residual fuel oil.

Petitioner entered into a series of contracts with Dalton Enterprises (Dalton) and Galaxy Petroleum Products (Galaxy) that provided that petitioner would sell fuel oil to Dalton and Galaxy and purchase a similar amount of crude oil from them. Pursuant to these contracts, purported crude oil was received at petitioner's refinery and unloaded. For each load, there was a bill of lading naming Dalton or Galaxy as the consignee and Midway-Sunset oil field (Midway-Sunset) in Taft, California, as the point of origin for the purported crude oil. After a truck was unloaded, the same truck loaded fuel oil at petitioner's refinery. For each load, there was a bill of lading naming Dalton or Galaxy as the consignee and Midway-Sunset as the destination for the fuel oil.

During the fiscal year ended January 31, 1981, petitioner purchased 162,147 barrels of what purported to be crude oil from Dalton and 100,557 barrels of what purported to be crude oil from Galaxy. This oil purchased from Dalton and Galaxy was in reality residual fuel oil which had been falsely labeled as crude. While there were some chemical distinctions between crude and residual fuel oil, the chemical differences were not of importance to petitioner's operations, and the tests performed by petitioner upon receipt of deliveries did not detect the differences. During the year at issue, petitioner did not know that residual fuel oil had been substituted for crude oil.

Since petitioner was purchasing what purported to be higher-priced crude oil from Dalton and Galaxy, while simultaneously selling identical quantities of lower-priced residual fuel oil to Dalton and Galaxy, it would periodically have to pay Dalton and Galaxy for the difference in price. Had petitioner paid the appropriate price for the oil that it purchased from Dalton and Galaxy, its purchases during the fiscal year ended January 31, 1981, would have been reduced by $846,488.25. Respondent determined that petitioner's cost of goods sold should be reduced by this amount.

Until shortly before trial, respondent had alleged that petitioner was a participant in the fraudulent scheme to

mislabel its purchases as crude oil. This position was completely abandoned prior to trial and the parties now agree that petitioner did not know, and had no reason to know, of the falsification scheme during the year at issue. It follows then that petitioner was the victim of a scheme in which it was overcharged for purchases. At trial, respondent took the position that these fraudulent overcharges should not be allowed as cost of goods sold, but rather, should be deducted in a later year as a theft loss pursuant to section 165(e). Since a theft loss is not allowed under section 165(e) until the tax year in which it is discovered, respondent reasoned that it was not allowable as a deduction in the year in issue.

Respondent's position at the trial was based upon our opinions in *B.C. Cook & Sons, Inc. v. Commissioner (Cook I)*, 59 T.C. 516 (1972), and *B.C. Cook & Sons, Inc. v. Commissioner, (Cook II)*, 65 T.C. 422 (1975), affd. per curiam 584 F.2d 53 (5th Cir. 1978).[7] In *Cook I*, the taxpayer was the victim of an embezzlement by its bookkeeper, who drew checks on the taxpayer's account and falsely reflected them as purchases. The phony purchases were reflected in the taxpayer's cost of goods sold for the years in which the funds were embezzled, thus reducing taxable income. Years later, when the taxpayer discovered the embezzlement, it took a theft loss deduction despite the fact that it had previously reduced taxable income by the same amounts for the prior years in which the embezzlement occurred. Some of the years during which the embezzlement occurred were closed by the statute of limitations. The Court held that because the taxpayer had "erroneously" used "nonexistent purchases" in computing cost of goods sold in prior years, it was proper to take the correct theft loss deduction in the year of discovery. *Cook I, supra* at 521. The opinion in *Cook I* suggested that the proper remedy for preventing double tax benefits is contained in the mitigation provisions of sections 1311-1315.

*Cook II* was the result of the Government's attempt to apply the mitigation provisions of sections 1311-1315 to disallow the cost of goods sold that the taxpayer had erroneously taken in years that would otherwise have been

---

[7]Respondent also cites *Wintner v. Commissioner*, T.C. Memo. 1977-144.

barred by the statute of limitations. In *Cook II*, we held that the mitigation provisions only apply to erroneous "deductions" taken in the prior years and that cost of goods sold, even when erroneously overstated, is not a "deduction" within the intent of the mitigation provisions. Thus, despite what we recognized as a double tax benefit, we found that the taxpayer "slips between the statutory cracks to gain an unwarranted tax advantage." *Cook II*, 65 T.C. at 432. *Cook I* and *Cook II* were both Court-reviewed opinions in which there were dissents. *Cook II* was affirmed on appeal with the circuit court stating:

> Because of the inequity in the result of this decision, we have worked hard to construct a convincing reversal of the Tax Court. Try as we may, however, we have decided that we cannot reverse with a principled decision. We, therefore, affirm the Tax Court on the basis of its opinion. 65 T.C. 422 (1975). [*B.C. Cook & Sons, Inc. v. Commissioner*, 584 F.2d 53, 54 (5th Cir. 1978).]

In *National Home Products, Inc. v. Commissioner*, 71 T.C. 501 (1979), we were confronted with a situation where the taxpayer had actually purchased and received goods that were then apparently stolen from its inventory. We held that the actual purchases in *National Home Products* distinguished it from *Cook I* and *Cook II* because in the latter situation the purchases were purely fictitious. We, therefore, held that the taxpayer in *National Home Products* properly reflected the stolen inventory as cost of goods sold in the year of the theft. *National Home Products, Inc. v. Commissioner, supra* at 528-531.[8]

The facts presented at the trial of the instant case are different from those presented in the previously cited cases. Here, we have purchases of actual goods that were physically placed in inventory and presumably reflected in

---

[8]We placed substantial reliance upon the provisions of secs. 1.165-7 and 1.165-8, Income Tax Regs., which say that the casualty and theft loss provisions of sec. 165 do not apply to losses "*reflected* in the inventories of the taxpayer." *National Home Products, Inc. v. Commissioner*, 71 T.C. 501, 527 n. 7 (1979). (Emphasis added.) These regulation sections were not mentioned in the majority opinions in *Cook I* or *Cook II*. If the phrase "reflected in the inventories" refers to inventory records, it is arguable that the regulations might support a result different than that arrived at in *Cook I* depending upon whether the embezzler recorded the fictitious purchases in the inventory records. On the other hand, if "reflected in inventories" means goods that had actually been placed in the physical inventory, then the regulations are consistent with the holding in *Cook I* regardless of the record keeping. See *B.C. Cook & Sons, Inc. v. Commissioner*, 59 T.C. 516, 522-523 (Tannenwald, J., concurring), 525-526 (Simpson, J., dissenting), and 526-528 (Quealy, J., dissenting) (1972).

petitioner's inventory records. The problem is that the goods actually placed in inventory were not the same goods that petitioner thought that it had purchased. As a result, petitioner paid a price substantially in excess of fair market value. Petitioner received actual goods and placed them in its inventory, but it never received the crude oil it had paid for and, in that sense, the purchase of crude oil was fictitious. Petitioner was the victim of false and fraudulent labeling which resulted in its being defrauded of substantial funds that were charged to purchases and eventually to cost of goods sold.[9]

Respondent's trial position was that this situation closely resembled the facts in *Cook I* and *Cook II* and that petitioner should deduct the excess costs under the theft loss provisions of section 165 in the year that it discovered the fraud rather than the year in which it was defrauded. Neither party has cited any cases directly on point.

Whether the fraud perpetrated on petitioner is more like a theft or embezzlement of money, as in *Cook I,* or more like a theft of physical inventory, as in *National Home Products,* and whether such distinctions would make a difference here, would require a metaphysical analysis. If the embezzler in *Cook I* had placed a peppercorn in inventory in return for the money he took, would there have been a different result? If not, how many peppercorns (or other inventory items) would it have taken to transform an embezzlement into a real (albeit fraudulently overpriced) purchase of inventory? Is a seller's fraudulent mislabeling of goods, in order to defraud a purchaser, in substance the same as an outright theft of money? We do not believe that we need to answer these questions in the context of this case. Having reviewed the previously cited cases, including the concurrences and dissents in *Cook I* and *Cook II,* and finding no authority that provides a clear answer, we conclude that respondent's legal position was founded upon

---

[9]Petitioner appears to have temporarily received the benefit of entitlements in the same amounts it would have been entitled to if it had purchased crude oil. However, in 1985, petitioner executed a consent order with the U.S. Department of Energy. Pursuant to the terms of the consent order, petitioner and the Department of Energy entered into a settlement wherein petitioner agreed to pay $500,000 to the Department of Energy.

rationale contained in existing precedent and was not unreasonable within the meaning of section 7430.[10]

In the recent case of *Phillips v. Commissioner*, 88 T.C. 529 (1987), affd. in part and revd. in part 851 F.2d 1492 (D.C. Cir. 1988), we held that the Government's litigating position was unreasonable because it was contrary to the Government's own revenue ruling. In doing so, we stated:

> Respondent's position in this case directly contradicted his long-standing and clearly articulated administrative position as set forth in Rev. Rul. 72-539, 1972-2 C.B. 634, and reiterated in Rev. Rul. 83-183, 1983-2 C.B. 220. Respondent's counsel may not choose to litigate against the officially published rulings of the Commissioner without first withdrawing or modifying those rulings. The result of contrary action is capricious application of the law. *Phillips v. Commissioner*, 86 T.C. 433, 442 (1986) (Simpson, J., concurring). * * * [*Phillips v. Commissioner*, 88 T.C. at 533-534. Fn. refs. omitted.]

We awarded litigation costs on this basis, but our opinion on this issue was reversed by the Court of Appeals because the Government's legal position in *Phillips* was based upon existing precedent that had not previously been overruled. *Phillips v. Commissioner*, 851 F.2d 1492 (D.C. Cir. 1988).

Petitioner has neither relied upon nor cited *Phillips* in its motion for litigation costs. However, for the sake of completeness, we observe that respondent issued a revenue ruling in 1981, stating that "The Internal Revenue Service will not follow the decisions of the United States Tax Court and the United States Court of Appeals in *Cook I* and *Cook II*." Rev. Rul. 81-207, 1981-2 C.B. 57. In his objection to petitioner's motion for litigation costs, respondent argues that his announcement of nonacquiescence in *Cook I* and *Cook II* related only to the facts presented in those cases, i.e., situations where the taxpayer included the stolen amounts in cost of goods sold in the year of the theft and then, after the period of limitations had expired for that year, claimed the same amount as a theft loss deduction in the year the theft was discovered, thereby obtaining a double tax benefit.

The facts in the instant case are distinguishable from those in Rev. Rul. 81-207. In addition, the legal rationale of

---

[10]In finding that respondent's position was not unreasonable, we certainly do not intend to in any way disparage respondent's decision to concede or to encourage him to resurrect the same legal position for application in similar cases.

the ruling is based upon the principle set forth in *Unvert v. Commissioner*, 72 T.C. 807, 814 (1979), affd. 656 F.2d 483 (9th Cir. 1981), that the "duty of consistency" prevents a taxpayer from obtaining a double tax benefit in certain situations.[11] *Unvert*, however, did not address the propriety of accounting for stolen money or goods as cost of goods sold. After reviewing the factual predicate, rationale, and cited authority contained in Rev. Rul. 81-207, we believe that respondent's explanation of the position taken in Rev. Rul. 81-207 is consistent with the overall reading of the revenue ruling. Petitioner has not established that respondent's preconcession position in this case was "directly contradicted" by a "clearly articulated administrative position" set forth in a revenue ruling. *Phillips v. Commissioner*, 88 T.C. at 534. It follows that the rule in *Phillips* has no application to this case.

*An appropriate order and decision will be entered.*

Reviewed by the Court.

NIMS, CHABOT, PARKER, KÖRNER, SHIELDS, COHEN, CLAPP, SWIFT, JACOBS, GERBER, WRIGHT, PARR, WELLS, WHALEN, and COLVIN, *JJ.*, agree with this opinion.

---

[11]In *Stahl Specialty Co. v. United States*, 551 F. Supp. 1237 (W.D. Mo. 1982), involving facts practically identical to *Cook I*, the District Court declined to follow *Cook I* because the result would be inequitable.