OAK KNOLL CELLAR, WILLIAM P. JAEGER, JR., TAX MATTERS PARTNER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Oak Knoll Cellar v. Commissioner
Docket Nos. 11758-92, 4239-93
United States Tax Court
T.C. Memo 1994-396; 1994 Tax Ct. Memo LEXIS 407; 68 T.C.M. (CCH) 412; 94-2 U.S. Tax Cas. (CCH) P47,958; August 18, 1994, Filed *407 For petitioner: R. Todd Luoma and Stephen T. Buehl. For respondent: Daniel J. Parent and Kathryn K. Vetter. DAWSON
DAWSON
MEMORANDUM OPINION DAWSON, Judge: These cases were consolidated for trial, briefing, and opinion. They have been reassigned to Special Trial Judge Stanley J. Goldberg pursuant to the provisions of section 7443A(b)(4) of the Internal Revenue Code (the Code) of 1986, as amended, and Rules 180, 181, and 183 of the Tax Court Rules of Practice and Procedure. The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE GOLDBERG, Special Trial Judge: This matter is before the Court on petitioner's Motion for An Award of Reasonable Litigation Costs under section 7430 and Rule 231. Petitioner does not seek any administrative costs he incurred in connection with the consolidated cases. Section references are to the Code in effect for the taxable years in issue; however, unless otherwise indicated, references to section 7430 are to the Code in effect at the time these cases were filed. [1] All Rule references are to the Tax Court Rules of Practice and Procedure. *408 Respondent, by notices of final partnership administrative adjustment (FPAA), determined adjustments to the income of Oak Knoll Cellar (the partnership) for its fiscal years ended June 30, 1988 (1988 year), and June 30, 1989 (1989 year), in the amounts of $ 3,240,963 and $ 169,412, respectively. The adjustments are attributable to respondent's termination of the partnership's election to use the last-in, first-out (LIFO) method of valuing inventory and recomputation of the value of the inventory using the first-in, first-out (FIFO) method; adjustments to the capitalization of inventory costs under section 263A; and adjustments made to the depreciation deductions the partnership claimed for certain caves used to store wine. The substantive issues in these cases were conceded by respondent shortly before trial. The issue for decision is whether William P. Jaeger, Jr. (petitioner), is entitled to an award of litigation costs. For purposes of petitioner's motion, respondent concedes that petitioner has substantially prevailed with respect to the amounts in controversy and that petitioner has exhausted the administrative remedies available to him. [2] We must decide whether respondent's *409 position was substantially justified within the meaning of section 7430(c)(4)(A)(i). In accordance with Rule 232, the parties have submitted declarations and memoranda supporting their positions. We decide the motion for litigation costs based on petitioner's motion, respondent's objection, petitioner's reply to respondent's objection, and the declarations and exhibits provided by both parties. There are conflicts of facts presented by each party. Neither party requested a hearing, however, and we conclude that a hearing is not necessary for *410 the proper consideration and disposition of this motion because the facts in dispute are not relevant to our conclusion. Rule 232(a)(3). The relevant facts, as drawn from the record and set out below, are not disputed. Background
In General
The partnership is a California limited partnership whose principal place of business at the time of the filing of the petitions was St. Helena, California. The partnership, formed in April 1976 to manufacture and sell premium Napa Valley wines, operates a winery located near St. Helena, California, and produces premium wines under the Rutherford Hill Winery label. Each year the partnership crushes several different varieties of grapes and produces several different varieties of wine from the resulting juices. Among the varieties of wine produced by the partnership are Cabernet Sauvignon, Sauvignon Blanc, Chardonnay, Zinfandel, and Merlot. The partnership did not own or operate any vineyards before July 1, 1988. Rather, the partnership purchased all of the grapes it used in the production of its wines. The grapes are of the same type, from the genus Vitis vinifera, and are all grown in Napa County, California. Grapevines are *411 divided by variety, by location, and by ownership into blocks. Grapes are harvested when the partnership's winemaking team determines that the grapes on the vine are ripe; i.e.; have reached the desired sugar level. Identical grape varieties in different blocks located only a few miles distant from each other may reach the desired sugar level several weeks apart, depending on a variety of factors including soil, water content of the soil, age of the vines, size of the crop being ripened, and elevation and microclimate of the location of the block. From year to year, the sequence in which the grape varieties have been harvested has changed, depending on when each particular block of grapes reaches its desired sugar levels. The cost of the grapes, the production costs, and the aging periods vary for each type of wine. The removal of the skins and seeds from the grape juice generally occurs immediately or soon after crushing for white grapes or red grapes made into pink wine, and as much as several days to a week later for red grapes which are to be made into red wine. Some wines are fermented in steel tanks while others are fermented in redwood or oak barrels. White wines take *412 about 6 to 12 months to age, and red wines take 12 to 24 months to age. White wines are aged an additional 3 to 6 months. Red wines are aged for an additional 1 to 2 years. The partnership sells wine in bulk as well as in bottled form. After the completion of the holding period in barrels or tanks, each wine variety that is not sold as bulk wine is bottled. Before bottling, the winemaking team decides what, if any, blending of different varieties is to occur. Some wine varieties, such as Chardonnay, usually are not blended before bottling. Other wine varieties, such as Cabernet Franc, are used almost exclusively as blending wines. Still other varieties, such as Cabernet Sauvignon and Merlot, are used for blending as well as being bottled as varietal wines. The partnership uses the specific-goods LIFO method, and two pools, i.e., wine and bottling costs, in accounting for inventory and cost of goods sold. In computing the value of inventory, the partnership uses an average cost per gallon to determine increments and decrements to the pool of wine gallons regardless of the varietal. During 1985 the partnership completed construction of some caves being built into a hillside *413 to store and age wine (caves). The partnership depreciated the caves on its Form 1065, U.S. Partnership Return of Income (partnership return), using a 5-year useful life. The caves have electricity and consist of a series of tunnels and side caves. The floors, walls, and ceilings are a combination of concrete and shotcrete. Examination of the Partnership Returns
The 1988 Return
Respondent's revenue agent Barbara Osborne (Osborne) started the examination of the partnership return for the 1988 year on December 6, 1990. During the audit of the 1988 year, Osborne toured the caves at the partnership's winery. She observed that the walls and floor of the caves were dry and that the partnership was in the process of digging a new cave and finishing an underground entertainment room at one end of the caves. In a summary report for the 1988 year (the summary report), Osborne proposed changing the partnership's method of accounting for inventory from the LIFO method to the FIFO method because she believed that the partnership had valued some of its inventory using the lower of cost or market method, contrary to the provisions of section 1.472-2(b), Income Tax Regs., which *414 generally requires that inventory must be valued at cost regardless of market value when the LIFO method for valuing inventory is used on the tax return. In the alternative, in order to clearly reflect income under the specific-goods LIFO method, Osborne proposed changing the partnership's LIFO method to (1) accounting for each varietal as an item within the LIFO pool in the manner prescribed under the regulations for the dollar-value LIFO method, or (2) accounting for each varietal as a separate pool under the specific-goods LIFO method of valuing inventory. In the summary, Osborne further proposed adjustments to the costs required to be capitalized and included in inventory pursuant to section 263A on the ground that the partnership had not capitalized interest on its Cabernet wine and had not accounted for cumulative section 263A costs. She also proposed changing the useful life of the caves from 5 to 18 years on the ground that the caves were a building and not a special purpose structure within the meaning of section 1.48-1(e)(1), Income Tax Regs.
The partnership replied to the summary report in a written response dated August 27, 1991. In its reply, the partnership asserted, *415 among other things, that it had not used market value for valuing inventory on its tax return but had used a market value reserve only for financial statement purposes. A closing conference for the 1988 year was held on August 27, 1991 (closing conference). That morning during a telephone conversation before the closing conference, Timothy Kelly (Kelly), who at the time apparently was the revenue agent in charge of respondent's Santa Rosa, California, office, informed Stephen Buehl (Buehl), the partnership's general counsel, that the revenue agents who were attending the closing conference might want to inspect the caves to resolve certain unagreed items, such as whether there was mold in the caves. Buehl responded that respondent's agents could inspect the caves at the end of the closing conference. Respondent's agents did not inspect the caves at that time, however, but agreed that, if necessary, a tour of the caves would be conducted sometime later following further research on the issues. During the closing conference Kelly advised the partnership's representatives that a technical advice request on the LIFO pooling issue had been submitted relating to an unrelated winery *416 that also had elected a similar specific-goods grouping. Kelly advised the partnership's representatives further that advice relating to the LIFO pooling issue was being sought from respondent's Sacramento District Office. During a telephone conversation between Buehl and Kelly on September 5, 1991, Kelly advised Buehl, among other things, that the technical advice request had not been submitted and that respondent's Sacramento District Office did not agree with Osborne's proposed varietal-by-varietal approach for accounting for inventories. Instead, that office favored a time-of-production grouping approach, such as white wine and red wine, with possible further subdivisions of the red wine if different varieties of red wine were produced over significantly different periods of time. On October 31, 1991, the partnership filed an amended partnership return for the 1988 year, to correct, among other things, the value of its inventory resulting from deductions mistakenly taken for that year for wines with market values less than cost. Respondent issued the FPAA with respect to the partnership for the 1988 year on March 3, 1992. In that FPAA respondent changed the partnership's *417 method of accounting for inventory from LIFO to FIFO, adjusted costs required to be capitalized and included in income under section 263A, and changed the useful life of the caves from 5 years to 18 years. The 1989 Return
Osborne started the examination of the partnership return for the 1989 year sometime after she started the examination of the 1988 partnership return. As a result of additional information provided to her by the partnership during the examination of the 1989 year, Osborne determined that the partnership had made a number of errors in calculating the value of its inventory for earlier years, both in the partnership's favor and to its detriment. She concluded that the cumulative effect of those errors resulted in no material distortion of the partnership's income. Consequently, Osborne decided to accept the partnership's LIFO method for the 1989 year. On April 9, 1992, Osborne advised the partnership's accountant that she was dropping the FIFO issue for the 1989 year. Respondent issued the FPAA for the 1989 year on December 4, 1992. In that FPAA the only item adjusted was the depreciation deduction claimed for the caves. The Petitions and Answers
*418 Petitioner filed his petition for readjustment of partnership items under section 6226 for the 1988 year on June 1, 1992. Respondent filed her answer on July 24, 1992. In the answer respondent conceded that the partnership was not required to change its method of accounting for inventory from the LIFO to the FIFO method. Respondent, however, affirmatively alleged in the answer that the partnership should be required to use a separate pool for each wine varietal in accounting for the value of its inventory. Petitioner filed his reply to the answer on September 8, 1992. The Court issued a notice dated December 2, 1992, setting the 1988 year for trial at a session beginning on June 21, 1993. Respondent filed a motion for continuance dated February 11, 1993, unopposed by petitioner and subsequently granted, citing as grounds that on December 4, 1992, respondent had mailed to petitioner an FPAA for the 1989 year involving the same issues as were involved in the 1988 year, [3] that the intricate and complex calculation of the proposed inventory adjustment for the 1988 year directly affected the 1989 year, and that a continuance would permit the parties to consolidate the related cases, *419 narrow the issues for trial, and pursue settlement. Petitioner filed his petition for readjustment of partnership items under section 6226 for the 1989 year on March 1, 1993. Respondent filed her answer on April 15, 1993. The Court issued a notice dated April 14, 1993, setting the 1988 year for trial at a session beginning in San Francisco on September 20, 1993 (the September 20 trial session). Respondent filed a motion on June 1, 1993, unopposed by petitioner and subsequently granted, to consolidate for trial, briefing, and opinion the cases for the 1988 year and the 1989 year and to set the 1989 year for trial also at the September 20 trial session. Other Actions
*420 On October 30, 1992, representatives of the partnership met with one of respondent's Appeals officers, Dennis Gallagher (Gallagher), to discuss the issues raised for both the 1988 and the 1989 years. Sometime later, Gallagher sent the administrative file to one of respondent's revenue agents to review Osborne's calculations. During March 1993, representatives of the parties met to discuss two other cases then docketed in this Court relating to an unrelated winery and also set for trial at the September 20 trial session. Counsel for the parties in the instant cases also were counsel in those unrelated cases. The primary issue in the unrelated cases was whether a separate specific-goods LIFO pool was required for each variety of wine produced by that winery. During that meeting, other specific-goods LIFO groupings were suggested, including a grouping consisting of one pool for red wines and one pool for white wines. Additional information was requested by respondent's agents to determine whether such a grouping would clearly reflect the winery's income. As of August 27, 1993, respondent's agents had not received all the information that they believed they needed to complete *421 that determination. During May 1993, Gallagher contacted the partnership's counsel to arrange for an inspection of the caves. Because of conflicting schedules of the representatives for both parties, the tour of the caves originally could not be scheduled until July 9, 1993, and then had to be rescheduled for August 6, 1993, because of a change in respondent's counsel and further scheduling conflicts. On August 12, 1993, following that tour, Gallagher informed the partnership's counsel that respondent would concede the depreciation issue. On August 2, 1993, Gallagher indicated to the partnership's counsel that respondent would consider settling the LIFO inventory method issue by the partnership's creating a pool for red wine and a pool for white wine. That grouping method for the partnership's wine inventory was similar to the grouping method being proposed to settle the cases involving the unrelated winery. On August 20, 1993, petitioner served on respondent and mailed to the Court a motion for determination of burden of proof on the issues remaining for trial. In her response to that motion, filed August 31, 1993, respondent admitted that she had the burden of proof for such *422 issues. On August 23, 1993, petitioner filed a motion for extension of time to submit an expert witness report or to permit expert witness to testify without a written report. In that motion petitioner alleged that he had engaged an expert witness to testify at trial relating to such matters as the validity of the partnership's specific-goods LIFO method of accounting for inventories and whether its method conforms with the requirements of the applicable Code and regulations provisions and clearly reflects income. Respondent opposed such motion in her reply filed August 31, 1993. At a meeting held on August 27, 1993, the parties' representatives discussed generally alternative inventory pooling arrangements for the partnership's wine, such as one pool for all wines, a pool for red wine and a pool for white wine, and a pool for each wine varietal. Thereafter, on September 2, 1993, petitioner submitted a settlement offer to respondent in which petitioner proposed the following: In order to settle the cases, petitioner is willing to do the following. Petitioner is willing to settle the LIFO issue along the lines of two specific items of (1) gallons of red wine and (2) gallons *423 of white wine, rather than the current single item of gallons of wine. Petitioner [the partnership] will change its method of accounting, however, only on a prospective basis; i.e., commencing with the year July 1, 1993, ending June 30, 1994. As part of the offer resolving the LIFO issue, with respect to the § 263A issue, respondent must agree that there is no adjustment in tax liabilities for 1988 and 1989. This settlement proposal also presumes that respondent has conceded the depreciation issue involving the wine caves.
At a conference held on September 8, 1993, to discuss petitioner's settlement offer, respondent agreed to concede the issues remaining for trial. Petitioner filed his motion for award of reasonable litigation costs with a memorandum and declarations in support of the motion on September 20, 1993. Petitioner filed supplemental declarations in support of his motion on October 22, 1993. Respondent filed her objection to petitioner's motion on November 19, 1993, to which petitioner filed a reply and second supplemental declarations on December 20, 1993. Discussion
Under section 7430(a), a taxpayer in a civil tax proceeding may be awarded a judgment *424 for reasonable litigation costs if that taxpayer is the "prevailing party". To be considered a prevailing party, the taxpayer must establish that the position of the United States in the proceeding was not substantially justified, the taxpayer has "substantially prevailed" with respect to either the amount in controversy or the most significant issue or set of issues presented, and he or she meets the net worth test as set forth in the Equal Access to Justice Act (EAJA), 28 U.S.C. section 2412(d). Sec. 7430(c)(4)(A). Furthermore, in order to be awarded litigation costs, the taxpayer must have exhausted the administrative remedies available to him or her within the Internal Revenue Service. Sec. 7430(b)(1). Moreover, the taxpayer may not be awarded litigation costs for any portion of the court proceedings which he or she has unreasonably protracted. Sec. 7430(b)(4). All of these requirements must be met. Polyco, Inc. v. Commissioner, 91 T.C. 963 (1988); Sher v. Commissioner, 89 T.C. 79, 83 (1987), affd. 861 F.2d 131 (5th Cir. 1988). The taxpayer bears *425 the burden of proving that he or she is entitled to an award of litigation costs. Rule 232(e); Coastal Petroleum Refiners, Inc. v. Commissioner, 94 T.C. 685, 688 (1990); Stieha v. Commissioner, 89 T.C. 784, 790 (1987). We will consider first whether respondent's position was substantially justified within the meaning of section 7430 because a determination favorable to respondent on this issue renders the remaining questions moot. Petitioner contends that respondent was not substantially justified in the position she took with respect to each of the issues involved in the instant cases. Respondent contends, on the other hand, that she was reasonable at all times in the position she took regarding the issues involved in these cases. We agree with respondent. Whether the Commissioner's position is substantially justified turns on a finding of reasonableness, based upon all the facts and circumstances, as well as legal precedents relating to the cases. [4] See Pierce v. Underwood, 487 U.S. 552 (1988) (construing similar language in the Equal Access to Justice Act, 28 U.S.C. sec. 2412 *426 (1988)); Huffman v. Commissioner, 978 F.2d 1139, 1147 (9th Cir. 1992), affg. in part and revg. in part and remanding T.C. Memo. 1991-144; Berotolino v. Commissioner, 930 F.2d 759 (9th Cir. 1991; Powers v. Commissioner, 100 T.C. 457, 471 (1993). A position is substantially justified if the position is "justified to a degree that could satisfy a reasonable person." Pierce v. Underwood, supra at 565; see also Norgaard v. Commissioner, 939 F.2d 874, 881 (9th Cir. 1991), affg. in part and revg. in part T.C. Memo 1989-390. For a position to be substantially justified, there must be "substantial evidence" to support it. Pierce v. Underwood, supra at 564-565. *427 Furthermore, in deciding whether the Commissioner's position was substantially justified, the Court will consider not only the basis of the Commissioner's legal position, but also the manner in which the Commissioner maintained that position. Wasie v. Commissioner, 86 T.C. 962, 969 (1986). The reasonableness of the Commissioner's position necessarily requires considering what the Commissioner knew at the time she took the position and the events that occurred afterwards. See Rutana v. Commissioner, 88 T.C. 1329, 1334 (1987); Don Casey Co. v. Commissioner, 87 T.C. 847, 862 (1986); DeVenney v. Commissioner, 85 T.C. 927, 930 (1985). The taxpayer need not show bad faith to establish that the Commissioner's position was not substantially justified for purposes of a motion for litigation costs under section 7430. Estate of Perry v. Commissioner, 931 F.2d 1044, 1046 (5th Cir. 1991); Powers v. Commissioner, supra.
The legislative history of section 7430 sets forth the following guidelines for determining *428 whether the Commissioner's conduct was unreasonable: The committee intends that the determination by the court on this issue is to be made on the basis of the facts and legal precedents relating to the case as revealed in the record. Other factors the committee believes might be taken into account in making this determination include, (1) whether the government used the costs and expenses of litigation against its position to extract concessions from the taxpayer that were not justified under the circumstances of the case, (2) whether the government pursued the litigation against the taxpayer for purposes of harassment or embarrassment, or out of political motivation, and (3) such other factors as the court finds relevant. * * * [H. Rept. 97-404, at 12 (1981).]
Absent extenuating circumstances, the Commissioner's adoption of a position that is clearly inconsistent with the position taken in other similar cases demonstrates unreasonableness. Hubbard v. Commissioner, 89 T.C. 792, 803 (1987). Moreover, the Commissioner's position may be unreasonable if the Commissioner failed to adequately investigate the case. Lennox v. Commissioner, 998 F.2d 244, 248 (5th Cir. 1993), *429 revg. and remanding T.C. Memo. 1992-382; Powers v. Commissioner, supra at 476. The fact that the Commissioner eventually concedes the case is not sufficient in itself to establish that a position is unreasonable. E.g., Estate of Merchant v. Commissioner, 947 F.2d 1390, 1395 (9th Cir. 1991), affg. T.C. Memo. 1990-160; Broad Ave. Laundry & Tailoring v. United States, 693 F.2d 1387, 1391-1392 (Fed. Cir. 1982); Powers v. Commissioner, supra at 471; Sokol v. Commissioner, 92 T.C. 760, 767 (1989). However, the Commissioner's concession does remain a factor to be considered. Powers v. Commissioner, supra.Nonetheless, just as a concession does not make an otherwise unreasonable position reasonable, see Hanson v. Commissioner, 975 F.2d 1150, 1156-1157 (5th Cir. 1992), a concession does not make an otherwise reasonable position unreasonable, see Price v. Commissioner, 102 T.C. 660, 664-665 (1994). *430 Whenever there is a factual determination, the Commissioner is not obliged to concede the case until the necessary documentation to prove the taxpayer's contention is received. See Egan v. Commissioner, 91 T.C. 705, 713 (1988); Bayer v. Commissioner, T.C. Memo. 1991-282. However, the Commissioner cannot escape an award of litigation costs simply because the issue presents a question of fact. Minahan v. Commissioner, 88 T.C. 492, 500-502 (1987); Frisch v. Commissioner, 87 T.C. 838 (1986). With these general principles in mind, we consider now the issues involved in the instant cases. The Applicable Position of the United States
We first must determine from which point we are to evaluate the position of the United States. Respondent's position as set forth in the answer for the 1988 year differs from her position in the FPAA for that year. Petitioner, relying on Sliwa v. Commissioner, 839 F.2d 602, 605-607 (9th Cir. 1988), and Golsen v. Commissioner, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), *431 argues that, because these cases are appealable to the Court of Appeals for the Ninth Circuit, we should review the position of the United States both before and after the commencement of litigation. Respondent, however, asserts that petitioner must prove that respondent's position in the proceedings in this Court was not substantially justified. We agree with respondent. Sliwa v. Commissioner, supra, which was decided under the 1982 version of section 7430 that contained no statutory definition for the phrase "position of the United States", is not applicable to the instant cases. Rather, because these cases were commenced after November 10, 1988, section 7430 as amended by the Technical and Miscellaneous Revenue Act of 1988 (TAMRA), Pub. L. 100-647, sec. 6239, 102 Stat. 3743, applies. See Huffman v. Commissioner, 978 F.2d 1139, 1144 (9th Cir. 1992), affg. in part and revg. in part T.C. Memo. 1991-144; Estate of Merchant v. Commissioner, supra at 1392 n.6. Section 7430(c)(7) as amended by TAMRA provides that in proceedings commenced after November *432 10, 1988, the position of the United States includes the position taken by the United States in a judicial proceeding and in an administrative proceeding as of the earlier of (1) the date of a taxpayer's receipt of the decision from respondent's Appeals Office or (2) the date of the notice of deficiency. In Huffman, the Court of Appeals for the Ninth Circuit agreed with this Court that, for proceedings commenced after November 10, 1988, section 7430 as amended requires a bifurcated analysis of "substantially justified" as to the position taken in the administrative proceeding and the position taken in the judicial proceeding. Huffman v. Commissioner, supra at 1146. Because petitioner is not seeking any costs for the administrative proceedings, our analysis is limited to the position taken by the United States in the judicial proceeding. For purposes of these cases, therefore, in order to recover his reasonable litigation costs petitioner must show that the position taken by the United States in the judicial proceeding was unreasonable. Sec. 7430(c)(7)(A). Generally, the position of the United States in a judicial proceeding is established *433 initially in the Commissioner's answer. Huffman v. Commissioner, supra at 1148. Our analysis therefore is limited to the reasonableness of respondent's position asserted in the answer and of her subsequent conduct in maintaining that position. Respondent's Position Relating to Petitioner's LIFO Inventory Method
In her answer for the 1988 year, respondent alleged that in accounting for the value of its inventory the partnership should be required to use a separate pool for each varietal of wine produced rather than using one pool for all of its wine. Petitioner contends that respondent had no legal or factual basis for challenging the specific-goods LIFO method the partnership used for valuing its inventory. Respondent, however, contends that it was reasonable for her to require the partnership to use more than one pool for its wine in accounting for inventory. A taxpayer's method of valuing its inventory constitutes a method of accounting; therefore, the treatment of inventories for tax purposes is governed by sections 446 and 471. Thor Power Tool Co. v. Commissioner, 439 U.S. 522 (1979); Hamilton Indus. Inc. v. Commissioner, 97 T.C. 120, 128 (1991); *434 Rockwell International Corp. v. Commissioner, 77 T.C. 780, 808 (1981), affd. per curiam 694 F.2d 60 (3d Cir. 1982). Sections 446 and 471 grant the Commissioner broad discretion in matters of inventory accounting and give the Commissioner wide latitude to adjust a taxpayer's method of accounting for inventory so as to clearly reflect income. Thor Power Tool Co. v. Commissioner, supra at 532-533; see Commissioner v. Joseph E. Seagram & Sons, Inc., 394 F.2d 738, 743 (2d Cir. 1968), revg. 46 T.C. 698 (1966); Thomas v. Commissioner, 92 T.C. 206, 220 (1989). Sections 446 and 471 have been interpreted as imposing a heavy burden of proof on a taxpayer disputing the Commissioner's determination on accounting matters. [5]Thor Power Tool Co. v. Commissioner, supra.
*435 Section 446(a) requires that taxable income be computed by a taxpayer under the method of accounting it regularly uses in keeping its books. Section 446(b), however, provides that where the method of accounting regularly utilized by the taxpayer does not clearly reflect taxable income, the computation of taxable income shall be made under such method, as, in the Commissioner's opinion, does clearly reflect income. On the other hand, when a taxpayer demonstrates that the taxpayer's method of accounting does clearly reflect income, the Commissioner cannot require that taxpayer to change to a different method even if, in the Commissioner's view, the Commissioner's method more clearly reflects income. Molsen v. Commissioner, 85 T.C. 485, 498 (1985). A taxpayer's accounting method clearly reflects income if it results in accurately reported taxable income under a recognized method of accounting. Wilkinson-Beane, Inc. v. Commissioner, 420 F.2d 352, 354 (1st Cir. 1970), affg. T.C. Memo. 1969-79; RLC Indus., Co. v. Commissioner, 98 T.C. 457, 490 (1992); see also Honeywell, Inc. and Subs. v. Commissioner, T.C. Memo. 1992-453. *436 Whether a particular method of accounting clearly reflects income is a question of fact which must be decided on a case-by-case basis. Peninsula Steel Prods. & Equip. Co. v. Commissioner, 78 T.C. 1029, 1045 (1982); Coors v. Commissioner, 60 T.C. 368, 394 (1973), affd. sub nom. Adolph Coors Co. v. Commissioner, 519 F.2d 1280 (10th Cir. 1975); see also Boecking v. Commissioner, T.C. Memo. 1993-497. For tax purposes, the requirement that a method of accounting clearly reflect income is paramount. Thor Power Tool Co. v. Commissioner, 439 U.S. at 538-544; see also Ford Motor Co. v. Commissioner, 102 T.C. 87, 99 (1994); Thomas v. Commissioner, supra at 220. Even if a method of accounting comports with Generally Accepted Accounting Principles (GAAP), such method will not control for tax purposes if it does not clearly reflect income. Thor Power Tool Co. v. Commissioner, supra at 538-544; see also Hamilton Indus., Inc. v. Commissioner, supra at 128; *437 UFE, Inc. v. Commissioner, 92 T.C. 1314, 1321 (1989); Sandor v. Commissioner, 62 T.C. 469, 477 (1974), affd. per curiam 536 F.2d 874 (9th Cir. 1976). However, if the taxpayer's method of accounting reflects a consistent application of GAAP, it will ordinarily be regarded as clearly reflecting income. Hallmark Cards, Inc. v. Commissioner, 90 T.C. 26, 31 (1988); sec. 1.446-1(a)(2), Income Tax Regs. But see Thor Power Tool Co. v. Commissioner, supra at 539-540. The Commissioner's mere acquiescence in the treatment of an item in prior years does not preclude adjustment in later years. Menequzzo v. Commissioner, 43 T.C. 824, 836 (1965); Massaglia v. Commissioner, 33 T.C. 379, 386-387 (1959), affd. 286 F.2d 258 (10th Cir. 1961). The Commissioner thus is not barred from requiring a taxpayer to change from an erroneously approved accounting method which does not clearly reflect income to an accounting method which does clearly reflect income. *438 Thomas v. Commissioner, supra at 225. Therefore, although the Commissioner's approval in prior audits of the taxpayer's accounting methods is given weight in determining whether the Commissioner is justified in changing the method used by a taxpayer, the Commissioner is not estopped from changing methods if that method does not clearly reflect income. Ezo Prod. Co. v. Commissioner, 37 T.C. 385, 391 (1961); see also Thomas v. Commissioner, supra at 225-226. Section 471 provides that inventories shall be taken by a taxpayer on such basis as the Commissioner may prescribe whenever, in the Commissioner's opinion, the use of inventories is necessary in order to clearly determine the income of the taxpayer. When inventories are required, they must be maintained on a basis that conforms as nearly as possible to the best accounting practice in the trade or business and that most clearly reflects income. Sec. 471; see also W.C. & A.N. Miller Dev. Co. v. Commissioner, 81 T.C. 619, 626 (1983); Fox Chevrolet, Inc. v. Commissioner, 76 T.C. 708, 719-722 (1981); *439 sec. 1.471-1, Income Tax Regs.
Section 472 permits taxpayers to value inventories under the LIFO method, which deems closing inventory to consist of the earliest purchased goods. Sec. 472(b)(1). By matching the cost of the most recently purchased goods with current sales revenue, the LIFO method removes from current earnings any artificial profits attributable to inflationary increases in inventory costs. Amity Leather Prods. Co. v. Commissioner, 82 T.C. 726, 732 (1984). Because section 472 expressly grants taxpayers the right to elect the LIFO method for purposes of inventorying their goods, the Commissioner's discretion as to an initial election of LIFO is more circumscribed than is generally the case as to changes of accounting method. See, e.g., John Wanamaker Philadelphia, Inc. v. United States, 175 Ct. Cl. 169, 174-177, 359 F.2d 437, 439-441 (1966); W.C. & A.N. Miller Dev. Co. v. Commissioner, supra at 626-627; Peninsula Steel Prods. & Equip. Co. v. Commissioner, supra at 1055. However, pursuant to section 1.472-3(d), Income *440 Tax Regs., the Commissioner has discretion to examine a taxpayer's tax returns and books and records pertaining to the taxpayer's LIFO method in order to determine whether the taxpayer will be permitted to continue to use the LIFO method elected. The two principal methods of computing inventory under the LIFO method permitted by the regulations are the specific-goods method, a measure of inventory in terms of physical units of individual items, see secs. 1.472-1 and 1.472-2, Income Tax Regs., and the dollar-value method, a measure of inventory in terms of total dollars of pools of goods, see sec. 1.472-8, Income Tax Regs.; see also Hutzler Brothers Co. v. Commissioner, 8 T.C. 14, 24-25 (1947). Under the specific-goods LIFO method, inventory is measured in terms of physical units of homogeneous items such as yards, gallons, or pounds. In computing a LIFO inventory under the specific-goods method, the quantity of items in a taxpayer's inventory at the end of the year is compared with the quantity of items of a like kind in its inventory at the beginning of the year to determine whether there has been an increase or decrease during the year. Fox Chevrolet, Inc. v. Commissioner, 72 T.C. 447, 452 (1979); *441 Wendle Ford Sales, Inc. v. Commissioner, 72 t.C. 447, 452 (1979); see also 1 Schneider, Federal Income Taxation of Inventories, sec. 12.01 at 12-2, sec. 12.04[1], at 12-31 (1994). Because the specific-goods LIFO method requires the matching of physical units, practically speaking, it is only used as a method for valuing inventories in those industries with inventories which contain a limited number of items with quantities that are easily measured in units. Wendle Ford Sales, Inc. v. Commissioner, supra.
In the case of raw materials, section 1.472-1(d), Income Tax Regs., provides that raw material in the opening inventory must be compared with similar raw material in the closing inventory. There may be several types of raw materials, depending upon the character, quality, or price, and each type of raw material in the opening inventory must be compared with a similar type in the closing inventory.
For goods-in-process and finished goods, section 1.472-3(a), Income Tax Regs., requires that the taxpayer's analysis of its beginning and ending inventories which is to be included with the taxpayer's application to use the LIFO convention should include a description *442 of: goods in process, and finished goods, segregating the products (whether in process or finished goods) into natural groups on the basis of either (1) similarity in factory processes through which they pass, or (2) similarity of raw materials used, or (3) similarity in style, shape, or use of finished products. * * *
Thus, under the specific-goods LIFO method for valuing inventory, items may be grouped in the same pool only if they are similar. The regulations, however, provide limited guidance as to what items will be considered similar under the specific-goods LIFO method. As an illustration, in the case of raw materials, section 1.472-1, Income Tax Regs., provides in part the following: (e) In the cotton textile industry there may be different raw materials depending upon marked differences in length of staple, in color or grade of the cotton. But where different staple lengths or grades of cotton are being used at different times in the same mill to produce the same class of goods, such differences would not necessarily require the classification into different raw materials. (f) As to the pork packing industry a live hog is considered as being composed *443 of various raw materials, different cuts of hog varying markedly in price and use. Generally a hog is processed into approximately 10 primal cuts and several miscellaneous articles. However, due to similarity in price and use, these may be grouped into fewer classifications, each group being classified as one raw material. [Emphasis added.]
Thus, it appears that the appropriate scope of a specific-goods grouping is a complex question depending on the facts and circumstances of the particular taxpayer. We do not decide here whether petitioner's specific-goods LIFO grouping of all its wine inventory into one pool did or did not clearly reflect income. We must determine rather whether respondent acted reasonably in challenging petitioner's specific-goods LIFO grouping. We believe that she did. The parties have not cited, and the Court has not found, any published opinion which directly addresses the appropriateness of a taxpayer's grouping of items under the specific-goods LIFO method. The importance of the proper grouping of items under the specific-goods LIFO method appears implicit in the very nature of that method, however. It may be reasonable for the Commissioner *444 to pursue litigation that may tend to clarify the law, even though such litigation will be burdensome and expensive for the taxpayer, and even though the Commissioner's chances of success may be marginal. See Hubbard v. Commissioner, 89 T.C. 792, 804 (1987); Don Casey Co. v. Commissioner, 87 T.C. 847, 862 (1986). The Commissioner may seek the reversal of precedent, or seek to carve out an exception to a well-established rule, but if she is unsuccessful, the taxpayer may be awarded litigation costs. See Don Casey Co. v. Commissioner, supra.But see Ashburn v. United States, 740 F.2d 843, 850 (11th Cir. 1984) (costs may be denied where issues involved are not simple, routine, or clear cut). Nonetheless, the Commissioner generally is not subject to an award of litigation costs under section 7430 where the underlying issue presents a question of first impression. E.g., Stebco, Inc. v. United States, 939 F.2d 686, 688 (9th Cir. 1990); Estate of Wall v. Commissioner, 102 T.C. 391 (1994); Stieha v. Commissioner, 89 T.C. 784, 791 (1987); *445 see also Hoang Ha v. Schweiker, 707 F.2d 1104, 1106 (9th Cir. 1983). But see Oregon Environmental Council v. Kunzman, 817 F.2d 484, 498 (9th Cir. 1987) ("Although the absence of adverse precedent on an issue is relevant to the determination of the 'substantially justified' question, it is not dispositive."). In the instant cases we cannot conclude from the record that the question of whether the partnership's pooling method clearly reflected its income is not an issue upon which reasonable arguments could be made. See, e.g., In re Petition of Hill, 775 F.2d 1037, 1042 (9th Cir. 1985). Furthermore, although there are no cases directly on point, when she filed her answer respondent had substantial legal precedents generally under the clear reflection of income theory to challenge the partnership's specific-goods LIFO method. See, e.g., secs. 446(b), 471(a); Thor Power Tool Co. v. Commissioner, 439 U.S. 522 (1979); Thomas v. Commissioner, 92 T.C. 206 (1989). Section 1.472-3(d), Income Tax Regs., moreover, gives the Commissioner *446 specific authority to examine a taxpayer's records to determine whether that taxpayer may continue to use the LIFO method elected. There is no evidence that respondent's counsel inserted the pooling issue in the answer on a whim or for any improper purpose. At the time the answer was filed, respondent's counsel was in possession of Osborne's summary report in which, in the alternative, petitioner's specific-goods LIFO grouping was challenged under the clear reflection of income. From the foregoing, we cannot conclude that respondent's position was unworthy of belief. Petitioner has made no attempt to establish that the partnership's grouping of all its wine inventory into one pool clearly reflects its income. Instead, petitioner relies on a legal argument to establish that respondent's position was unreasonable. According to the partnership, it properly elected the specific-goods LIFO method and has consistently applied that method from the time of its election through the years in issue. The partnership asserts that its LIFO method is consistent with the accounting methods used in the wine industry and is consistent with GAAP. Accordingly, petitioner argues, because the partnership *447 has consistently applied a LIFO method specifically authorized in the Code and the regulations, under the principles set forth in Hallmark Cards, Inc. v. Commissioner, 90 T.C. 26, 31 (1988), and Orange & Rockland Utils. v. Commissioner, 86 T.C. 199, 215 (1986), the partnership's LIFO method is deemed to clearly reflect income and respondent therefore cannot change that LIFO method. Therefore, petitioner asserts, respondent's position did not have any basis in law or fact and thus was unreasonable from the outset. We do not agree. Petitioner's argument totally ignores respondent's authority under section 1.472-3(d), Income Tax Regs., to determine during audit whether a taxpayer may continue to use the LIFO method it had elected. Moreover, in Ford Motor Co. v. Commissioner, 102 T.C. 87 (1994), we recently addressed a similar argument. There the taxpayer argued that its accounting method for tax purposes of deducting the full amount of all future payments it was obligated to make under "structured settlements" with tort claimants conformed with a method of accounting authorized by the Code *448 and the regulations and therefore clearly reflected income. We observed: Petitioner also relies on Hallmark Cards, Inc. v. Commissioner, 90 T.C. 26 (1988). Petitioner contends that because the Code allows taxpayers to use an accrual method, the Commissioner has no authority to reject the method when it meets the all events tests for accrual. In furtherance of its contention, petitioner cites the following statement from Hallmark Cards: Respondent's broad authority to determine whether a taxpayer's accounting method clearly reflects income is limited, in that he may not reject, as not providing a clear reflection of income, a method of accounting employed by the taxpayer which is specifically authorized in the Code or regulations and has been applied on a consistent basis. [Hallmark Cards, Inc. v. Commissioner, 90 T.C. at 31; citation omitted.]
We think that petitioner interprets the foregoing quote too broadly. As we read Hallmark Cards, we addressed only the question of whether the all events test had been met for the accrual of income by the taxpayer. * * * the principle that a method specifically *449 sanctioned in the Code or regulations cannot be rejected under section 446(b) is derived from Orange & Rockland Utilities, Inc. v. Commissioner, 86 T.C. 199, 215 (1986). In that case, we held that the "cycle meter reading" method provided in the regulations and used by the taxpayer was a permissible method under section 446(c)(2). Orange & Rockland dealt with a specific method of accrual; it did not suggest that any method of accrual is to be protected from the Commissioner's scrutiny under section 446(b). Consequently, we do not think that Hallmark Cards stands for the proposition that no accrual method may be rejected under section 446(b) merely because section 446(c) permits an accrual method to be used. Indeed, in Estate of Ratliff v. Commissioner, 101 T.C. 276, 281 (1993), we recently stated that Hallmark Cards stands for the proposition that "respondent does not have unbridled discretion under section 446 in that she cannot force a taxpayer to adopt another method of accounting if the taxpayer's method clearly reflects income." In short, we view Hallmark Cards as addressing only the issue of *450 whether the taxpayer satisfied the all events test. [Ford Motor Co. v. Commissioner, supra at 97-98; emphasis added.]
Similarly, we do not believe that no LIFO method of valuing inventory may be rejected under section 446(b) merely because section 472 permits the use of a LIFO convention. Indeed, section 1.472-3(d), Income Tax Regs., specifically provides that "whether or not such method [the taxpayer's LIFO inventory method], once adopted, may be continued * * * will be determined by the Commissioner in connection with the examination of the taxpayer's income tax returns." Accordingly, we find that petitioner's reliance on Hallmark Cards and Orange & Rockland is not sufficient to establish that respondent's position on the LIFO issue had no basis in law or fact and therefore was unreasonable. As further support for his position, petitioner relies on a statement Kelly made to Buehl in September 1991 to the effect that respondent's Sacramento District Office did not agree with the varietal-by-varietal method proposed by Osborne. Petitioner contends that such statement further demonstrates that respondent's position in the answer for *451 the 1988 year was not substantially justified. The Sacramento District Office, however, did not agree with the partnership's specific-goods LIFO method of using one pool for all the wines it produced, but instead allegedly, at that time, that office favored a time-of-production grouping, such as a pool for red wine and a pool for white wine. Respondent's representatives apparently did agree, however, that the partnership's specific-goods LIFO method for valuing inventory did not clearly reflect income. We do not agree with petitioner that a difference in opinion among respondent's representataives as to the appropriate composition of the specific-goods LIFO pools illustrates that the position respondent asserted in the answer was unreasonable. There is no evidence that, when she filed the answer, respondent adopted her position relating to the partnership's specific-goods LIFO grouping to extract concessions from petitioner that were not justified under the circumstances or for purposes of harassment or embarrassment, or out of political motivation. See H. Rept. 97-404, at 12 (1981). Nor is there any evidence that respondent's position in these cases was clearly inconsistent *452 with the position she has taken in other similar cases. Cf. Hubbard v. Commissioner, 89 T.C. 792, 803 (1987). Instead, the record shows that respondent's position on the partnership's specific-goods LIFO grouping was substantially the same as the position she was taking for at least one other winery. Petitioner's proposal to settle the cases on the same basis as that unrelated winery's settlement of the same issue -- of prospectively changing the partnership's specific-goods LIFO method to one pool for red wine and one pool for white wine -- further supports an inference that there was a reasonable basis for respondent at least to challenge petitioner's specific-goods LIFO method. In the instant cases, respondent's position was not contrary to any published decision. Nor could a reasonable person say that it lacked colorable justification. Furthermore, from the record here, we cannot conclude that respondent's position that a specific-goods LIFO grouping consisting of only one pool for all wine did not clearly reflect the partnership's income had no reasonable basis in fact or law. See Pierce v. Underwood, 487 U.S. at 565. *453 Consequently, we find that petitioner has not shown that respondent's position was not substantially justified at the time she filed her answer. Alternatively, petitioner contends that even if the Court determines that respondent's position was substantially justified in the beginning, nonetheless respondent's position became unreasonable at some later point. Petitioner asserts that respondent's stated reasons for conceding the cases [6] are illogical or involve factors that were present from the time that respondent filed her answer. Petitioner suggests that these circumstances demonstrate that respondent's actions in her conduct of the cases, at a minimum, were unreasonable from the time she filed her answer. *454 For the reasons discussed above, petitioner has not persuaded us that when respondent filed the answer, and subsequently, her position that the partnership's specific-goods LIFO method did not clearly reflect income was unreasonable. Moreover, we are satisfied from this record that throughout the proceedings, respondent actively and diligently proceeded under that reasonable theory. In addition, the LIFO issue involved in these cases is far from simple and apparently a question of first impression. Under such circumstances, we cannot conclude that respondent's position was unreasonable for purposes of section 7430. See Minor v. United States, 797 F.2d 738, 739 (9th Cir. 1986); Estate of Wall v. Commissioner, 102 T.C. at 394; see also Edwards v. McMahon, 834 F.2d 796, 802-803 (9th Cir. 1987) (issue of first impression); Rawlings v. Heckler, 725 F.2d 1192, 1196 (9th Cir. 1984) (issues unsettled); Cornella v. Schweiker, 741 F.2d 170, 171 (8th Cir. 1984) (issues were question of first impression in circuit; factual issues were *455 not simple). We fail to see why respondent's position should be determined unreasonable simply because she concluded that it was better to concede the cases rather than to litigate such a complex issue, especially in light of her concession that she would have the burden of proof on this issue. In addition, petitioner argues that respondent's concession of the cases was not timely. Petitioner asserts that, because respondent neither requested nor otherwise sought information from petitioner after the issuance of the FPAA, respondent had all of the information she needed to decide to concede the cases from the very beginning, and therefore she should not have waited until less than 2 weeks before trial to concede the cases. We do not agree. It appears from the record, however, that even though respondent may not have requested specific information from petitioner following the filing of the answer, additional information was requested from the unrelated winery to make the complex calculations needed to check the effect on income of various pooling methods. Presumably, that information would have aided respondent in the instant cases as well. We note further that settlement negotiations *456 between respondent and petitioner continued into September of 1993. Under such circumstances, we cannot conclude that respondent took too long to concede the cases. Respondent's Position Relating to the Capitalization of Inventory Costs
Under section 263A and the regulations promulgated thereunder, a taxpayer generally must capitalize certain indirect costs allocable to the production of goods and include those costs in inventory. In the FPAA and in the answer for the 1988 year, respondent took the position that the costs the partnership was required to capitalize and include in inventory pursuant to section 263A had to be adjusted. Respondent notified petitioner on September 8, 1993, that she was conceding this issue. In his motion for determination of burden of proof, petitioner alleged that respondent had the burden of proof on the section 263A capitalization issue because the adjustments alleged under section 263A are sufficiently different when considering LIFO rather than FIFO and, consequently, the section 263A adjustments proposed in the answer constituted new matter. In her reply to that motion, respondent conceded that the section 263A adjustment was a new matter *457 and therefore she had the burden of proof as to that issue. [7]
Respondent contends that her position that the partnership had failed to capitalize interest costs attributable to Cabernet Sauvignon and production costs for some varietals of wine that were in process for over 1 year was reasonable. Petitioner contends merely that the section 263A capitalization issue was tied to the LIFO inventory issue and therefore had no basis in law or fact because the LIF0 inventory issue had no basis in law or fact. Petitioner has the burden of proof on this issue. Rule 232(e); Coastal Petroleum Refiners, Inc. v. Commissioner, 94 T.C. 685, 688 (1990). For the reasons stated above relating to the LIFO inventory issue, petitioner *458 has not met his burden of proving that respondent's position on the section 263A capitalization issue was not substantially justified. Respondent's Position Relating to Depreciation of the Caves
Under section 168, the accelerated cost recovery system (ACRS) generally provides a depreciation deduction for new or used tangible depreciable property used in a trade or business or held for the production of income over statutory recovery periods based on the category of property involved. Most business machinery and equipment has a 5-year recovery period, whereas most real property placed in service before May 9, 1985, and after March 15, 1984, has an 18-year recovery period. On the partnership returns for 1988 and 1989, the partnership claimed depreciation deductions for the caves under ACRS on the basis of a 5-year recovery period. [8] In the FPAA and in the answer for both the 1988 and the 1989 years, respondent took the position that the caves are buildings (real property), not special purpose structures (equipment), for depreciation purposes and therefore should be depreciated using the applicable ACRS rates for buildings based on the year the caves were placed in service *459 (in these cases using the rates for 18-year real property). Respondent notified petitioner on August 12, 1993, that she was conceding this issue. The applicable recovery period for the caves depends on whether they are classified as equipment, as *460 petitioner alleged, or as a building, as respondent contended. Section 1.48-1(e)(1), Income Tax Regs., defines a building generally as a structure or edifice that encloses a space within its walls, is covered by a roof, and has as its purpose the furnishing of shelter or housing, or of working, office, parking, display, or sales space. That regulation provides further generally, however, that the term "building" does not include a structure which is essentially an item of machinery or equipment or a structure which houses property used as an integral part of manufacturing, production, or extraction, or of furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services, if the use of the structure is so closely related to the use of that property that the structure clearly can be expected to be replaced when the property it initially houses is replaced. See, e.g., McManus v. United States, 863 F.2d 491 (7th Cir. 1988); Brown-Forman Distillers Corp. v. United States, 205 Ct. Cl. 402, 499 F.2d 1263 (1974); Loda Poultry Co. v. Commissioner, 88 T.C. 816 (1987); *461 Central Citrus Co. v. Commissioner, 58 T.C. 365 (1972). Respondent contends that her position that the caves did not qualify as special purpose structures was reasonable on the basis of the information available to her when the answer was filed. Petitioner contends merely that respondent was dilatory in deciding to concede this issue. According to petitioner, respondent knew as early as August 1991 that a tour of the caves was needed to resolve certain factual matters pertaining to the caves, but that tour did not occur until August 6, 1993 -- 14 months after the answer was filed for the 1988 year. Respondent then immediately conceded the issue after the tour. Petitioner asserts that if respondent had acted in a diligent manner, the depreciation issue could have been conceded before the issuance of the FPAA for the 1988 year. Respondent counters that she was not dilatory in conceding this issue because her representatives toured the caves 4 months after she filed the answer for the 1989 year and she conceded the issue less than 1 week after that tour. Under the circumstances present in these cases, we do not believe that respondent waited an unreasonable *462 period of time to concede the depreciation issue. On this record, petitioner has not established that the position of the United States was not substantially justified. This is not a situation where review of the administrative file would have shown that respondent's position was untenable. Cf. Bayer v. Commissioner, T.C. Memo. 1991-282; Leewaye v. Commissioner, T.C. Memo. 1988-129. At the time the answer was filed for the 1988 year, the information in the summary report relating to the caves supported respondent's position that the caves did not qualify as a special purpose structure. A tour of the caves was necessary before respondent had sufficient information to formulate her decision to concede the depreciation issue. We do not believe the 13-month delay from the time the answer for the 1988 year was filed until the issue was conceded to be unduly long under the circumstances present in the instant cases. During the months between the filing of the answer for the 1988 year and respondent's concession of the depreciation issue, the FPAA for the 1989 year, involving the identical depreciation issue, was issued *463 and the petition and answer were filed in this Court as well as the motion to consolidate the cases. Respondent attempted to arrange for a tour of the caves within a month of the filing of the answer for the 1989 year. The tour could not be scheduled earlier than July 1993, however, because of scheduling conflicts involving counsel for both sides, and then had to be postponed until August 1993 because of a change in respondent's counsel. Respondent conceded the depreciation issue within 2 weeks of the tour of those caves. Furthermore, during the months between the filing of the answer and the concession of the depreciation issue, the parties were actively and diligently involved in discussions relating to the more complex LIFO inventory issue. That issue was not conceded until after the depreciation issue was conceded. There is no evidence that respondent delayed conceding the depreciation issue in an attempt to extract unjustified concessions from petitioner or for any other improper purpose. See Gantner v. Commissioner, 92 T.C. 192, 197-198 (1989), affd. 905 F.2d 241 (8th Cir. 1990); Sher v. Commissioner, 89 T.C. 79, 84-85 (1987), *464 affd. 861 F.2d 131 (5th Cir. 1988); see also H. Rept. 97-404, at 12 (1981); cf. Frisch v. Commissioner, 87 T.C. 838, 841 (1986); Williford v. Commissioner, T.C. Memo. 1994-135. Petitioner has presented no evidence which would show that respondent took her position on the depreciation issue for any reason other than because she thought her position was correct. See Vanderpol v. Commissioner, 91 T.C. 367 (1988). Petitioner relies merely on respondent's ultimate concession of the issue to support his claim that respondent's position in the litigation was not substantially justified. However, respondent's concession of the cases in and of itself is not sufficient to establish that her position was unreasonable. Estate of Merchant v. Commissioner, 947 F.2d 1390, 1395 (9th Cir. 1991), affg. T.C. Memo. 1990-160; Price v. Commissioner, 102 T.C. at 662-663; Sokol v. Commissioner, 92 T.C. 760, 767 (1989); Powers v. Commissioner, 100 T.C. at 471. *465 "Substantial justification for a position is not the same as a winning, legally correct argument on a position." Gantner v. Commissioner, supra at 198. Petitioner, moreover, has not shown that his attorneys incurred costs which they would not have incurred if the caves had been toured at an earlier date. See Brice v. Commissioner, T.C. Memo. 1990-355, affd. without published opinion 940 F.2d 667 (9th Cir. 1991). On this record, we conclude that respondent's position was not unreasonable. Accordingly, we conclude that petitioner does not satisfy the statutory definition of "prevailing party" for any issue involved in these cases and is not entitled to an award for litigation costs. Having concluded that petitioner is not the prevailing party within the meaning of section 7430, we need not decide whether petitioner satisfied the net worth requirements and whether the amounts of litigation costs sought by petitioner are reasonable. Accordingly, petitioners motion for litigation costs will be denied. To reflect the foregoing, Appropriate orders and decisions will be entered. Footnotes
1. Because the proceedings in the instant cases were commenced after Nov. 10, 1988, sec. 7430, as amended by the Technical and Miscellaneous Revenue Act of 1988 (TAMRA), Pub. L. 100-647, sec. 6239, 102 Stat. 3743, applies.↩
2. It is unclear from the record whether petitioner has satisfied the net worth requirement of sec. 7430(c)(4)(A)(iii) (see Rule 230(b)(6)). Respondent does not allege that petitioner unreasonably protracted the proceedings. See sec. 7430(b)(4). We therefore deem that issue also conceded. See Rule 151(e)(4) and (5); Petzoldt v. Commissioner, 92 T.C. 661, 683 (1989); Money v. Commissioner, 89 T.C. 46, 48↩ (1987).
3. The change to the partnership's LIFO method of accounting for the 1988 year resulted in a decrease in partnership income for the 1989 year. According to respondent, she intended to treat both years consistently, but showed only the depreciation issue on the FPAA for the 1989 year pending resolution of the inventory issue for the 1988 year.↩
4. For civil actions or proceedings commenced after Dec. 31, 1985, sec. 1551(d)(1) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2752, changed the language of sec. 7430 describing the position of the United States from "unreasonable" to "was not substantially justified." This and other courts, however, have held that the "substantially justified" standard is not a departure from the previous reasonableness standard. E.g., Sokol v. Commissioner, 92 T.C. 760, 764↩ n.7 (1989).
5. In the instant cases, respondent conceded that she had the burden of proof for the inventory valuation and sec. 263 capitalization issues initially raised in the answer for the 1988 year. The fact that respondent bears the burden of proof, however, does not nullify her authority under the clear reflection of income theory to challenge petitioner's grouping of items under the specific-goods LIFO method. Cf., e.g., Ferrill v. Commissioner, 684 F.2d 261 (3d Cir. 1982), affg. per curiam T.C. Memo. 1979-501 (material distortion of income theory under sec. 446(b) raised in amendment to answer); Seligman v. Commissioner, 84 T.C. 191, 198 (1985), affd. 796 F.2d 116 (5th Cir. 1986) (the Commissioner may assert specific reasons for disallowance of deductions or credits in the notice of deficiency, in the answer, or in an amendment to the answer); German v. Commissioner, T.C. Memo. 1993-59↩ (clear reflection of income theory raised in amendment to answer).
6. In her opposition to petitioner's motion for litigation costs, respondent gave the following reasons for her decision to concede the cases rather than settle on the basis proposed by petitioner: Respondent's decision to concede these cases was based on a number of factors. These include, inter alia↩, an unacceptable settlement proposal, the inability to anticipate the nature of the testimony of petitioner's expert and litigating hazards with respect to a very complicated issue.
7. We make no decision here on the merits of petitioner's allegations and respondent's concession as to who would have had the burden of proof on such issue. But see Seagate Technology, Inc. & Consol. Subs. v. Commissioner, 102 T.C. 149↩ (1994).
8. In the petition, petitioner alleges that the caves are special purpose structures that are designed specifically to provide for the aging of fine wine under unique, subterranean temperature and humidity conditions that maximize the quality of the wine. As such, petitioner alleges, the caves do not have the appearance of a building, nor do they function like a building, but rather they function like an item of machinery or equipment. Petitioner further alleges that the purpose of the caves is not to provide shelter or housing or to provide working, office, parking, display, or sales space and that the caves are not reasonably adaptable to, and could not economically be used for, any purpose other than their current use for the carefully controlled aging of fine wine.↩